THE STATE OF OHIO, APPELLEE, *v.* McDANIEL, APPELLANT.*

(No. 2370—Decided December 6, 1956.)

*Mr. Mathias H. Heck, Mr. John R. Hoover* and *Mr. Harold B. LeCrone,* for appellee.

*Mr. Herbert M. Eikenbary* and *Mr. W. Gale Everman,* for appellant.

HORNBECK, J. This is an appeal from conviction and sentence of defendant for the offense of manslaughter in the first degree.

Three errors are assigned:

1. That the verdict and judgment are contrary to law.
2. That it is against the manifest weight of the evidence.
3. All other errors upon the face of the record.

---

*Motion for leave to appeal overruled, May 1, 1957. Appeal dismissed, **166 Ohio St., 378.**

However, appellant, in her brief, urges only that the conviction and sentence are against the manifest weight of the evidence. We are not required to give consideration to any error assigned which is not briefed, but we may, in the interest of justice, consider the other claimed errors.

The indictment was drawn under Section 2901.06, Revised Code, and charged that defendant unlawfully killed Roy Boian.

The evidence discloses that the defendant and Roy Boian had, for some time, been keeping company with each other. They had separate apartments, but each had a key to both apartments, and for some time prior to the killing had lived together in defendant's apartment. Boian was a bowler and a member of a bowling team. On the night that he was killed, November 1, 1955, he had bowled with his team against another team, and the defendant had accompanied him to the bowling alleys. It is her testimony that, during most of the evening, she sat in a row of chairs back of the alleys, alongside other women. She testified that some bowler had spent considerable time conversing with a woman who sat beside her, and that Boian thought this man had been talking to the defendant, which made Boian angry. She testified further that Boian drank heavily during the time he was bowling; that she saw him go to the bar five times; that each time he passed her he would make some nasty remark; and that, as they were driving from the bowling alley to defendant's apartment, Boian quarreled with defendant and struck her as many as thirty to fifty times and threatened to run into a pole, and would have done so had she not veered the car. When they reached her apartment, Boian informed the defendant that he wanted the key to his apartment and certain of his personal effects. Defendant said that he continued to beat her, and that each time she would bring an article to him he would strike her again; that she attempted to get his key off a key ring; that she was unable to do so with her hands, and reached on a nearby kitchen table and secured a paring knife and had pried the ring loose and secured his key; that thereafter he attempted to wrest the knife from her, and in so doing cut his hand; that this made him violently angry; that, prior to his cutting his hand, she had attempted to get away from him by running down a stairway; that he overtook her, shoved her

upstairs and struck her as he pushed her up, and said to her that he was going to give her the beating of her life; that after he was cut on the hand he said to the defendant that he was going to fix her face so that it would be months before "anyone will have a date with you"; and that Boian had his fist drawn back to strike her when she struck him with the knife. She said that she was continually requesting him not to hit her and to quit the altercation, but that he persisted and struck her in various parts of the body many times. She said that she was greatly in fear of him; that when she struck him with the knife, she was merely trying to protect herself. At no time did she admit a purpose or intent to kill Boian. After Boian was stabbed, he picked up his effects, left the apartment, got into his automobile, drove some distance toward his apartment and into a clump of trees, where he was found dead. The medical testimony was to the effect that he died from the knife wound, which had entered the heart and caused a slow seepage of blood therefrom.

There is considerable evidence as to the good reputation of the defendant for peace and quiet. It appeared that she had not at any time been arrested, and that she was regularly employed. One witness testified that she did not sustain a good reputation for peace and quiet. There is considerable evidence that Boian, although quiet and of a very fine disposition when sober, was quarrelsome and disagreeable when intoxicated.

The defendant, after she was arrested at about 3 a. m. of the day succeeding the night of the killing, gave her version of the facts surrounding the attack and the killing. It is probable that the defendant did not know that Boian was dead until she was taken to the police station on the morning of November 2. In her first statement, although in many particulars identical with her testimony at the trial, she denied that she had cut Boian with the knife and demonstrated how it had been held, in which position she could not have stabbed him. A few hours later, and probably after consultation with an attorney who had formerly represented her, she changed her story and admitted that she did cut Boian with the knife, and her statement in this confession was substantially the same in all material particulars as her testimony at the trial.

After all the testimony of the defense had been given, it came to the attention of counsel that three young women who lived in apartments adjoining that of the defendant knew something of the occurrences of the night of the killing and were willing to testify, and they did testify. Their statements bear every evidence of the truth. They had no reason whatever to favor one party rather than the other, and they had no interest whatever in the outcome of the case. Their testimony substantially supports the evidence of the defendant that Boian was the aggressor; that he struck her many times; that she implored him to desist; and that she ran down the stairs.

It is notable that there is no evidence whatever from which an inference can be drawn that the defendant was the aggressor in the occurrences in her apartment prior to and at the time of the killing.

The testimony of defendant was corroborated, in part, as to the extent of injuries suffered by her by reason of the assault of Boian upon her. She had one black eye, her lips were discolored and there is some evidence that she suffered other injuries which could be attributed to the beating given her by Boian.

When the defendant admitted that she struck Boian with the knife, resulting in his death, the jury had the right to draw the inference from these facts alone that she intended to kill him, inasmuch as he died from the wound.

In the opening statement to the jury the assistant prosecutor, among other things, said that "where the state claims voluntary manslaughter it wasn't done maliciously, it was done in the heat of passion, hot blood, *intentional killing.* * * * We don't deny that; and we feel after you have heard all the evidence in this case, you will feel the same about it. There may have been, there was sufficient reason for her, in her own mind, to get in the condition of passion, hot blood, and therefore stabbing him." (Emphasis ours.)

Counsel for the defendant, in his opening statement to the jury, questioned that the death of Boian was the result of stabbing, saying: "Whether he stabbed himself, a stab in self-defense, while in the struggle, I am just giving you the ramifications." This statement was not definite as to the theory of the

defense as to the manner in which the knife was used which resulted in the death of Boian. However, upon the whole record it is manifest that defendant, on her plea of not guilty and upon her testimony while admitting the stabbing, denied the intent to kill Boian and stated that she was in fear of great bodily harm and her sole purpose was to protect herself, which she did in self-defense.

These developments require a consideration of the general charge of the court, with the purpose to determine whether the jury was properly instructed as to the essentials of proof incumbent upon the state to secure a conviction and incumbent upon the defendant to secure an acquittal upon her defense of self-defense.

Prior to the codification of the criminal statutes, manslaughter was defined in Section 6811, Revised Statutes (1 S. & C., 403):

"That if any person shall unlawfully kill another without malice, either upon a sudden quarrel or unintentionally, while the slayer is in the commission of some unlawful act, every such person shall be deemed guilty of manslaughter * * *."

It will be noted that manslaughter as thus defined incorporated different forms of killing, either of which was manslaughter. One was the unlawful killing of another without malice upon a sudden quarrel, or *unintentionally* while the slayer was in the commission of some unlawful act. The use of the word, "unintentional," in the alternative phrase of this statute is significant. Section 2901.06, Revised Code, now provides that manslaughter in the first degree is an unlawful killing.

It is said, in *Johnson* v. *State,* 66 Ohio St., 59, 63, 63 N. E., 607, 90 Am. St. Rep., 564, 61 L. R. A., 277, and *State* v. *Schaeffer,* 96 Ohio St., 215, 221, 117 N. E., 220, L. R. A. 1918 B, 945, that Section 12404, General Code (predecessor to Section 2901.06, Revised Code), is no different in substance and meaning from former Section 6811, Revised Statutes. It is probable that Section 2901.06, Revised Code, includes voluntary and involuntary manslaughter.

As we have hereinbefore noted, the state claimed it would prove that the killing of Boian was done in hot blood and in-

tentionally. That is to say, that the act committed was voluntary manslaughter. This requires consideration whether intent to kill must be established as an element of this class of manslaughter. We express no final opinion upon it, but call the attention of the judge who may try this case, if it is tried again, to this aspect of the proceeding.

The general charge of the trial judge set forth four material allegations which it was incumbent upon the state to establish, no one of which included the obligation of proving that the defendant at the time of the stabbing of Boian intended to kill him. As a matter of fact, although the jury was told that it must find that the defendant killed Boian unlawfully, the charge specifically said:

"Manslaughter is where a person unlawfully kills another without thought or intent to kill and without malice."

In the case of *State* v. *Armbrust,* 35 Ohio Law Abs., 554, at page 558, 42 N. E. (2d), 214, Judge Barnes and this court approved the following charge as to manslaughter:

"As I have said to you, if a man purposely uses a deadly weapon upon another, one calculated to produce death, the intent to wound or kill may be inferred from the use of the weapon, and the manner in which it was used; but whether such person had such intent or whether he did not is a question of fact for the determination of the jury from all the facts and circumstances in evidence."

So, here, although the instrument used was not in itself a deadly weapon, by the manner of its use it may have been found to be such, and, as its use resulted in the death of Boian, intent to kill could be inferred. However, did that take away the ultimate question of whether, upon all the facts appearing, the intent to kill was established?

In the case of *State* v. *Carter,* 41 Ohio Law Abs., 545, the eighth headnote reads:

"Voluntary manslaughter is the unlawful and intentional killing of a human being while the slayer is under the influence of sudden passion or heat of blood produced by adequate and reasonable provocation, and before reasonable time has elapsed for the blood to cool and reason to assume its habitual control."

*State* v. *McCoy,* 14 Ohio Law Abs., 363, involved an indict-

ment charging the defendant with unlawfully killing another. The trial judge discussed at length therein the elements of voluntary and involuntary manslaughter. The second, third and fourth headnotes read:

"In voluntary manslaughter the will of the accused plays an important part, for as the term indicates, an intentional killing is meant.

"Involuntary manslaughter is the unintentional killing of a human being while in the commission of an unlawful act which act is the proximate cause of the killing.

"Where no intentional killing is shown the burden rests upon the state to prove beyond a reasonable doubt that the defendant at the time of the homicide was in the commission of an unlawful act."

See, also, 40 Corpus Juris Secundum, 904, 918, Homicide.

It was not the theory of the state, according to its opening statement, that the defendant at the time of the killing was in the commission of an unlawful act but that the killing itself was unlawful, but the evidence tended to show such a killing.

We are not unmindful that our Supreme Court has said in three cases that an intent to kill is not an essential of manslaughter either at common law or in Ohio. *Montgomery* v. *State*, 11 Ohio, 424; *Sutcliffe* v. *State*, 18 Ohio, 469; and *Cline* v. *State,* 43 Ohio St., 332, 1 N. E., 22.

In the *Montgomery case,* the charge to the jury stated that intent to kill was not an essential of manslaughter, which was approved, but see the opinion at page 427, where it is said: "If so, an intent to kill is not a necessary ingredient of manslaughter *under this clause of the statute.*" (Emphasis ours.) The clause of the statute referred to is that which defined involuntary manslaughter.

In the *Sutcliffe case,* the charge was a killing while in the commission of an unlawful act—an assault with a gun.

In the *Cline case,* the charge was on counts of shooting with intent to kill and shooting with intent to wound. In the opinion, at page 335, the court made the statement: "But to convict of manslaughter it is not necessary to show either malice or intent to kill or wound. It is sufficient to show an unlawful killing."

Manifestly, the court was referring to involuntary manslaughter.

In 3 Fess Ohio Instructions to Juries, 267, this charge is carried:

"If you find that he killed her intentionally and unlawfully, in a sudden heat of passion, and upon sufficient provocation within the law given you by the court, your verdict will be manslaughter."

See *Davis v. State*, 25 Ohio St., 369; 40 Corpus Juris Secundum, 904, 918, Homicide.

The question is not free from doubt, but merits careful consideration if this case is again tried.

As we have before stated, there is no evidence in the record from which an inference may be drawn that the defendant, prior to and at the time of the killing, was the aggressor. In defining the right of self-defense, as applied to the defendant, the charge reads:

"The law makes a distinction between the case of a person driven to the necessity of taking a life in self-defense in a conflict provoked and incited by her own wrong and that one reduced to such necessity in a conflict that was neither sought nor provoked by her. In a case when a party assailed is in the wrong herself, she must, before taking the life of her assailant, or to avoid great bodily injury, flee as far as she conveniently can either by reason of some wall or other impediment, or as far as the fierceness of the assault will permit, for it may be so fierce as not to allow her to yield a step without manifest danger to her life or great bodily harm; and then in her defense she may kill her assailant instantly."

The court then stated the obligation of defendant if Boian was in the wrong. Inasmuch as the jury was charged respecting the difference in the obligation of defendant if she were the assailant from that if she were not, it had the right to conclude that there was some evidence upon which it might find that the defendant was the aggressor. If so, it could well say that she did not at the time of the cutting retreat to the wall.

Although it would appear to be of little consequence and probably correct upon the facts in this case, the charge may

not be correct in another trial in defining the conditions under which the defendant would have been justified in taking the life of Boian. This is the language of the charge:

"The danger must in either case be actual or apparent, and the party killing must have honestly believed that she was in danger of losing her own life or of suffering some great bodily harm before killing her assailant. And it is not enough that the party killing honestly believed that there was imminent danger to herself; the circumstances must have been such as would have afforded a reasonable ground for such belief; and this the jury must judge from the circumstances as developed by the testimony. *If the appearances were such as would have alarmed a reasonable person in the careful and proper use of her faculties* and have impressed her that such danger was imminent, and if the assailed party honestly believed such to be the case, it is not material whether the danger was real or not." (Emphasis ours.)

In *Nelson* v. *State,* 42 Ohio App., 252, 181 N. E., 448, the distinction to which we refer is stated in the first paragraph of the syllabus:

"One pleading self-defense in a homicide case has a right to have the fear which he claims induced him to fire the fatal shot measured by his own physical and mental constitution, and not by that of a hypothetical reasonable man."

In that case the court had said: "It must appear that the circumstances were sufficient to excite the fear of a reasonable person similarly situated, and that the defendant acted in good faith." In support of the syllabus, *State* v. *Sheets,* 115 Ohio St., 308, 152 N. E., 664, is cited.

We cannot properly evaluate the weight of the testimony had the jury been given the correct principles of law controlling their verdict. The charge, in the main, was correct and complete, and fully and carefully defined the respective rights of the parties. But in some, and possibly all, of the particulars to which we have directed attention, defendant's rights were not fully protected and may have affected the verdict to her prejudice.

We find the verdict and judgment were manifestly against the weight of the evidence.

The judgment is reversed and cause remanded for a new trial.

*Judgment reversed.*

MILLER, P. J., and WISEMAN, J., concur.