## STATE v ARMBRUST

Ohio Appeals, 2nd Dist, Franklin Co

No 3385. Decided Nov 14, 1941

Ralph J. Bartlett, Prosecuting Attorney, Columbus; T. Vincent Martin, Asst. Pros. Atty., Columbus, for plaintiff-appellee.

John A. Connor, Columbus; John D. Connor, Columbus, and Charles E. Connor, Columbus, for defendant-appellant.

## OPINION

By BARNES, J.

The above-entitled cause is now being determined as an error proceeding by reason of defendant's appeal on questions of law from the judgment of the Court of Common Pleas of Franklin County, Ohio.

On or about November 29, 1940, the defendant, Clarence Armbrust, was indicted by the grand jury of Franklin County, Ohio, of the crime of second degree murder. The action came on for trial in March, 1941, resulting in a verdict of guilty of manslaughter and not guilty of second degree murder.

Motion for new trial was duly filed,

overruled and sentence imposed as authorized by the verdict. Within statutory time notice of appeal was filed, whereby the cause was lodged in our Court.

The assignments of error are two in number, and omitting the formal parts, read as follows:

"1. The misconduct of the Prosecuting Attorney. Counsel for the defendant-appellant in cross-examining John McKenna, one of the witnesses called on behalf of the State, the witness was asked, in substance, to state the attitude of the defendant-appellant when he picked up the knife, and the witness answered, in substance, that the attitude of the defendant-appellant was jokingly, and that he laughted. The Assistant Prosecutor, T. Vincent Martin, interposed a sarcastic remark, to-wit, 'Some joke', audible to the jury, and meant to be audible to the jury, which remark constituted misconduct on the part of the Assistant Prosecutor, Martin, and affected the substantial rights of this defendant-appellant.

2. The court erred in overruling the defendant-appellant's request to include in the general charge to the jury a charge on accidental death, although the request was seasonably made by counsel at the close of the court's general charge, and even though the question of accidental death had been at issue both in argument and in testimony throughout the trial of the case."

A brief summary of the facts involved will be found helpful to a proper understanding of the manner in which the claimed errors arose.

On Saturday night, August 24, 1940, at about 11:45, Charles Mays was killed by a knife wound entering the chest of his body, passing through the heart sac and other vital organs and extending to or near the vertebrae. The alleged homicide occurred at what is known as the Jolly Time Grill, located at 1680 Arlington Avenue, Franklin County. The Jolly Time Grill was a night club where liquors were dispensed as well as sandwiches and other

light lunches. The defendant, in company with two other young men, went to the Grill in the late evening and all had drinks, mostly beer but possibly some whiskey. All had been drinking more or less during the afternoon and early evening. Shortly after the defendant and his companion had entered the Grill another party of six young men came in, among them being the deceased, Charles Mays. Neither crowd knew the other. When the party of six entered, one of the party, probably accidentally, brushed against a boy by the name of Schwab. Remarks were exchanged between Schwab and the boy brushing against him, which later brought on from another one of the six a challenge to Schwab to fight. Schwab, while not a member of the party of three, yet was known by them. After Schwab and his challenger went outside, their differences were settled, possibly principally through the urge and argument of Schwab. The defendant went to the door and observed his acquaintance, Schwab, with two other men, who proved to be a part of the party of six. The defendant inquired of Schwab if they were jumping on him and was advised not. The defendant then went back to the door and told his friend McKenna, one of the party of three, that his friend Schwab had had some argument outside. McKenna then went to the door and inquired as to who was the bully. One Metz, who is the man who had challenged Schwab, said that he was. Thereupon he and McKenna started to fight. McKenna was the stronger and had Metz backed up against the building. Metz resorted to the trick of calling out that the cops were coming. When McKenna loosened his hold on Metz, and looked around, the latter struck McKenna in the mouth, breaking a tooth, which brought about considerable bleeding. The altercation outside was then over. McKenna, the defendant and one other person then retired to the kitchen for the purpose of cleaning the blood off McKenna's face. While in the kitchen the defendant, Armbrust, picked up a knife and placed it

within his belt. Defendant claims that he did this more as a joke or in a spirit of braggadocio. After putting the knife in his belt, he called McKenna's attention to the fact and there is testimony that McKenna told him to put that damned thing away. The defendant, still carrying the knife, together with the others went back to the bar and continued to drink. Immediately after the altercation on the outside, the party of six, including Mays, got in their car and left the Grill. Later they returned. At or about this time the defendant and McKenna went to the men's toilet, a very small room in the rear, described as being about 3 ft. by 5 ft., with a commode and lavatory. There was some congestion at the door, due to the smallness of the men's toilet. In other words, there was a sort of waiting line on the outside until the ones on the inside would come out. As the defendant was leaving he came face to face with Metz who was entering. The defendant made the salutation, "Well", and Metz returned with the same, "Well". At this instant, McKenna, smarting under his broken tooth, made some remark to Metz and they at one started fighting out in the aisle way near this toilet. At this instant, Mays struck the defendant in the face, knocking him down, he landing in between the fixtures in the toilet. No other person was in the toilet at the time. As far as is disclosed from the evidence, neither Mays nor the defendant had ever seen each other before. Following the blow, Mays was heard to say, presumably to the defendant, "You damned dirty son of a bitch". No one other than the participants saw anything that occurred following Mays striking the defendant. The defendant testifies that after he was knocked down Mays was proceeding toward him, and at the instant of using the epithet the defendant pulled the knife out. He said he pulled it out as a bluff and because he was mad. He disclaims that he used the knife but says that Mays must have tripped or fallen. He denies that he used any force or any pressure on the knife what-

ever. It next appears that Mays came out of the door and dropped to the floor and instantly died. The defendant went out the rear door and finding the knife still in his hand, threw it away a short distance from the Grill. He then went to another grill. The knife was found the next day in the alley within 100 feet of the rear door. It was introduced in evidence as an exhibit. It was claimed to have had blood on one side of it.

After the defendant left the grill and went to the Chateau Night Club there is evidence that he put a dollar bill on the counter and asked an employee, Catherine Miller, to have a drink, saying that where he was going he wouldn't need the money. Another employee of this Chateau Night Club testified that he heard the defendant say that he had just stabbed a man. There is also testimony that he made a statement to another person, narrating in a general way what had happened and ending with the words, "What could I do?"

The next morning, Sunday, he was taken to the police station by his father. During the afternoon of this Sunday and at later days in the week, he was questioned by the police officers. During his cross-examination he was inquired of as to certain statements that he made to the officers, some of which were contrary to his testimony. He admitted making the statements but said they were not true. His excuse for making the statements was that he was not under oath.

We think we have narrated sufficient to make understandable the claimed errors. This is particularly true since no question is raised that the verdict was against the manifest weight of the evidence.

Under assignment No. 1, the record sustains the contention as to the remark made by the Assisting Prosecuting Attorney. However, it appears that the trial court did not hear it, but did say in the presence of the jury that if any such remark was made it should not have been made. It is obvious that the re-mark was improper, but we can not conclude that it was prejudicial. The court's admonition was sufficient to acquaint the jury with the impropriety.

In the stress of a lawsuit, it frequently happens that counsel on either side of the table improperly make comments back and forth, but it is only where such conduct is so manifestly harmful or so persistent without any admonition from the trial court, that it can be said to be prejudicial. Of course, in the instant case counsel in his argument would be within his rights in so characterizing defendants claim that he put the knife in his belt as a joke. We find no prejudicial error in assignment No. 1.

We now consider assignment No. 2.

Counsel for defendant in their brief urge that their defense throughout was accidental and not self-defense. The bill of exceptions contains not only the trial statements of counsel but also all the arguments.

The defendant in a criminal action, through his plea of not guilty, thereby invokes all defenses known to the law. The trial court can only know the specific nature of the defense through the trial statements, arguments and the presentation of evidence. We think not only the trial statement but the argument of defendant's counsel would warrant the trial court in concluding that the defense of self-defense was presented.

At the close of the court's general charge, counsel for defendant made the request that the court charge specifically on the defense of accidental death. The court thereupon made the observation' "I have already said that in order to find a verdict of guilty, there had to be a purposeful killing. This is just the reverse of that." Counsel for defendant still insisted on their request.

Counsel for the State cite the case of **State v Champion, 109 Oh St 281.** In the reported case the trial court charged on the defense of accidental death, but refused the request of counsel for defendant to charge on self-defense. In

**558**

syllabus 3, the court makes the following pronouncement:

"3. In a case of homicide where defendant testifies that she did not intend to fire the fatal shot, and that she did not intentionally 'pull the trigger', such testimony is entirely inconsistent and irreconcilable with the right of self-defense."

Counsel for defendant cite the following cases:

State v Crowley, 139 S. W. (2nd) (Mo.), 473.

State v Bryant, 213 N. C. 752; (197 S. E. 530).

Patterson v State, 184 S. E. 309 (Ga.).

Calderon v United States, 279 Fed. 556.

Beverly v State, 99 S. W. (2nd) (Tex.) 925.

In the Crowley case, supra, syllabi 1 and 2 reads as follows:

"1. Where the theory of accident or misfortune finds support in evidence, trial court is bound to instruct fully and clearly as to the law relating to accident or misfortune.

2. In murder prosecution, failure to instruct upon accidental homicide was reversible error, although such instruction was not requested by defendant, where defendant's evidence showed that defendant drew gun to defend himself, and that, while holding his gun with his back to the crowd and deceased, defendant was struck from the rear and that the gun went off accidentally."

In the Beverly case, supra, syllabus 2 reads as follows:

"2. In murder prosecution, wherein accused introduced evidence that revolver went off accidentally when pointed at deceased who had been threatening him, refusal to instruct on law of accidental homicide was reversible error."

We refrain from making quotations from the other cases, but will say that they are all supporting.

Counsel for defendant in their argument present the claim that the defendant's possession and drawing of a weapon may be in self-defense, but the actual infliction of the mortal wound may be an accident. The █ authorities cited support this argument and it seems to us as sound in reason.

We have no difficulty in following the Champion case, 109 Oh St, supra, but the charge of the court and the facts there under consideration were definitely different. While the language used in Syllabus 3 in the Champion case, supra, is very broad in its terms and apparently is all-inclusive of any conditions, yet the principle of law is well recognized that we must always read any pronouncement of the court in the light of the facts under consideration.

While agreeing with counsel for defendant on the law of accidental death, yet we think that taking █ the court's charge as a whole the issuable question was properly presented to the jury and they could not possibly have misunderstood. At page 172 of the record, where the court was charging on the included offense of manslaughter, we find the following language:

"As I have said to you, if a man purposely uses a deadly weapon upon another, one calculated to produce death, the intent to wound or kill may be inferred from the use of the weapon, and the manner in which it was used; but whether such person had such intent or whether he did not is a question of fact for the determination of the jury from all the facts and circumstances in evidence."

On the same page, but separated by one paragraph, we find the following:

"Now, it is contended by the defendant that he did not purposely use the knife or thrust the same voluntarily into the person or body of Charles Mays, but he does contend that in drawing this knife he drew the same in

protection of himself. That question, together with all other questions of fact, are for your determination as I have said from all the facts and circumstances in evidence."

The above-quoted paragraphs of the court's charge. together with the charge as a whole, can leave no doubt in our minds that the jury was adequately charged upon the question of accidental death. Of course, the trial court might have occupied more time on this particular defense, but where the principle is so obvious no useful purpose can be gained by making a lengthy charge.

If, as the defendant contended, the deceased fell on the knife and inflicted the wound upon himself, then it could not be determined that the defendant purposely used a deadly weapon upon Mays. Further than this, the court pointed out to the jury what the defendant's claim was: "Now, it is contended by the defendant that he did not purposely use the knife," etc. It may be argued that since no one but the defendant saw or knows about the use of the knife and no evidence being introduced relative thereto other than that of the defendant, that thereby the evidence is conclusive as to defendant's claim and the jury must have misunderstood the charge of the court or their verdict would have been "Not guilty". This argument, if made, could not be accepted 100%.

Circumstantial evidence has its place in every lawsuit. The jury may have concluded that in this small room, 3 x 5 in dimensions. it would be impossible for the deceased to fall on the knife and inflict a wound of the character shown in the evidence. Also, the statements of the defendant made within an hour after the accident, fail to present the claim of accident. Likewise many of the statements made to the police officers on the day following and thereafter, were contradictory of his testimony.

Finding no prejudicial error, the judgment of the trial court will be affirmed and the cause remanded for further proceedings according to law.

GEIGER, PJ. and HORNBECK, J., concur.