THE STATE OF OHIO, APPELLEE, *v.* CARVER, APPELLANT.

(No. 873—Decided September 28, 1971.)

*Mr. Everett Burton,* prosecuting attorney, for appellee.

*Mr. William L. Howland* and *Mr. Charles Huddleston, Jr.,* for appellant.

GRAY, J. This cause is in this court upon appeal from a judgment of the Court of Common Pleas of Scioto County wherein defendant was found guilty by a jury verdict of murder in the first degree, with mercy recommended. Defendant, feeling aggrieved at this result of his trial before the jury, filed his notice of appeal and assigned the following errors:

"1. The court erred in admitting oral statements allegedly made to the prosecutor's secretary by an 18 year old defendant held incommunicado for four hours between 1:30 and 5:30 a. m., charged with murder, with only a formalistic or perfunctory advice as to his rights, when the secretary was only able to report part of the alleged confession because the other statements were 'off the record.'

"2. The court erred in directing that the jury be selected and examined piece meal, once on the question of belief in capital punishment and again on other factors without asking whether 'his opinions precluded him from finding the accused guilty of an offense punishable with death.'

"3. The court erred in failing to dismiss the indictment after a jury had been impanelled where it was admitted that defendant was prosecuted as an aider and abettor under Section 1.17 Ohio Revised Code and not as a principal, where the principal had been indicted but had not yet been brought to trial.

"4. The court erred in overruling defendant's motion for a directed verdict at the close of the state's case and at the close of all the evidence because of the failure of the state to prove defendant's guilt, a 'purposeful' homicide, a corpus delicti or a robbery.

"5. The court erred in permitting the introduction into evidence over defendant's objections, statements made by Paul Dyer, Maurice Dyer and Robert McCleary.

"6. The court erred in permitting the introduction into evidence over defendant's objections, of an incident occurring on September 3, 1969, involving Paul Dyer, and in failing to instruct the jury as to the purpose for which this evidence was received.

"7. The court erred in failing to instruct the jury that, from the undisputed testimony, defendant had withdrawn from any alleged conspiracy and altercation, and in failing to properly respond to the jury's inquiry concerning the law of withdrawal.

"8. The court erred in refusing defendant's request to charge on the lesser included offenses of manslaughter, assault with intent to rob, and assault and battery.

"9. The court erred in declining to submit to the jury defendant's written special instruction tendered after argument on the subject of accessories after the fact.

"10. The court erred in permitting the prosecuting attorney to state to the jury that defendant asked 'How much did we get,' that this case was just like the case of a lookout for a bank robbery, and that the defendant should be punished to make the streets of Portsmouth safe for the jurors, prosecutor and otherwise."

During the evening of September 3, 1969, defendant, age 18, spent some time with Paul Dyer, age 22, Maurice Dyer, age 17, and Robert McCleary, age 16. Later, in the early morning hours of September 4, 1969, Maurice Dyer and Robert McCleary went to Tony's Bar and Grill located on Gallia Street in the city of Portsmouth. It was reported by the two juveniles to the two older boys that a "queer" was sitting in a white automobile near the Acme Paint Store at Fourth and Sinton in Portsmouth, and that "they could get money off of him." Maurice and Bob went to the automobile. The victim was behind the wheel and was working on the glove compartment. Paul and defendant followed. Paul opened the door of the car and started hitting the victim. Defendant opened the door on the driv-

er's side and tried to "jerk" him out. Bob McCleary kicked him a couple of times. The four of them finally got him on the sidewalk. Paul and the deceased scuffled. Defendant stated that he didn't think that deceased "was hurt other than *us* hitting on him" (emphasis supplied). The fight attracted the attention of motorists passing by. Defendant walked over to the cars and told the drivers to move on. The deceased, Bill Lynn Samuel, was "hollerin for someone to go to the police." During the course of the affray Paul pulled out his knife and stabbed Bill. The knife blade penetrated the left chest in the first intercostal space, the lung and also the arch of the aorta. Bill died in a few minutes.

Maurice and Bobby left the scene together. Paul and defendant left the area later and then went to Stu Barber's Bar. The bartender testified that "Mike called me over to the edge of the bar and asked me if anybody came in to say he had been there all evening."

In his statement to the police defendant made the following admission:

"A. 'How did he say it? He said I stuck him with a knife. I don't think I cut him very bad. When we got there I told Doug if anybody came in looking for us to tell them we had been sitting there for awhile. Then we sat down in a booth and told them to get us a beer. We walked around the side of the building of the Acme Paint Store. *We* asked how much money they got off of him." (Emphasis supplied.)

Paul had originally gone to Tony's Bar and Grill to see his girl friend who was a "go-go" girl at that establishment. Paul was interfering with her dancing and the bartender and the owner were required to request that Paul not intrude again. At that time Paul had a knife in his hand "punching it in the table." The knife was opened and defendant was sitting across the table from him.

Barbara Bloomfield, a girl friend of the bartender at Tony's, testified that she was at the bar waiting to go on a date with her boy friend after closing. That at about 1:30 a. m. on September 4, 1969, Paul, Maurice, Robert and defendant were all standing close to her booth getting ready

to leave, at which time the following conversation took place:

"Q. What did Paul Dyer say at that time?

"Mr. Huddleston: Objection.

"The court: Overruled.

"* * * [Defendant's exceptions noted]

"A. Paul, whenever they were getting ready to leave, Paul called to me and said, Barb, come here a minute. I walked over to him and he said, tell Brenda I'll be back after while, not to worry, there's money involved and for her to stay put. I'll be back."

She testified further that she saw all four of them go toward the Acme Paint Store. This store is near where the homicide occurred.

A driver of an autmobile wrecker was passing by on an early morning call. He testified as follows:

"A. Few more fists throwed, you know, fighting and then somewhere on the way, somebody had pulled a knife, I'd say it was a knife, and took a couple three [sic] jabs at the fellow in the chest. One of them was standing back a little ways. The other guy was near the victim when they did that. Then the victim turned to me and asked or hollered, would I call the police or call the law or some words like that and turned and went back to fight or try to get to his car. When he did, he fell face first on the side walk.

"Q. What happened to the other two people you observed there fighting with him earlier?

"A. The two guys there they ran to the side of the building through the Kroger's lot.

"Q. Did they leave together?

"A. Yes."

Later, the four assailants were arrested by Officer Daniel Heid of the Portsmouth Police Department. He described the arrest in the following manner:

"* * * We went around the front and at this time observed four subjects coming out. They were pointed out by Mr. Snyder as the ones he seen run from there. I placed them . . . arrested them and placed them against the car and this Paul Dyer he had a busted mouth and his mouth

was swollen and had blood on his left front of his shirt. Mr. Carver, I believe, had a slight beard at that time. And I placed them against the car and searched them and at this time found a knife in Mr. Carver's left front pocket. It was 4½ inches long folded up. I opened the knife up. It appeared to have damp blood on it. As I did, when I took the knife, he said, that's not my knife, it's not my knife. I called for another cruiser so we could keep them more or less separated, the four of them. Another cruiser came. I had him take the two juveniles, Maurice Dyer and McClary. I took Paul Dyer and Mike Carver in my cruiser. Upon reaching the station we got out of the car, went in, took Mr. Carver up to the window. As I got up to the window, I read him his rights, I carry a card with their rights so I can read it to them, be no problem."

At about 5:30 a. m., September 4, 1969, the statement of defendant concerning his activities earlier that morning were taken in the Portsmouth Police Department in the presence of Paul Williams, investigator in the prosecutor's office. Detective Earl Bowling of the Portsmouth Department, Mrs. Helen Bandy, stenographer in the prosecutor's office who recorded the proceedings in shorthand, and defendant. Mrs. Bandy testified from her stenographic notes as to the admissions made by defendant.

Defendant took the knife used in the homicide from Paul and put it in his pocket, intending to get rid of it but did not do so before he was apprehended by the police.

Defendant told the investigators that they planned to get some money from the deceased and intended to use force to accomplish the robbery. They expected to get a large amount of money and defendant intended to take his share and go to California. It is revealed by the record that defendant was AWOL from his Navy unit and had been such for several months.

Before the robbery took place it was reported that the victim carried his money in his left sock. When the body was searched, both shoes were off, as was the left foot sock. The robbery yielded the sum total of $1.00. When the body of the victim was searched no money was found on the corpse,

The third assignment of error is without merit. That question was answered long ago in 1850. It is not necessary that the principal be convicted before the aider and abettor is tried. *Noland* v. *State* (1850), 19 Ohio 131. See *Allen* v. *State* (1859), 10 Ohio St. 287; *Brown* v. *State* (1869), 18 Ohio St. 496; *Hartshorn* v. *State* (1876), 29 Ohio St. 635.

We now come to consider the second assignment of error. In examining the record, we find that a total of 46 prospective jurors were examined, and that out of that number a panel of 12 and one-alternate juror were chosen. Defendant either passed the prospective jurors for cause or stood silently by while each juror was seated. Finally, when the panel of 12 was seated, and again when the alternate juror was chosen, defendant stood silently by, voicing no objection to the manner or method of their choice. If he had any valid objections he thereby waived them. *State* v. *Duling* (1970), 21 Ohio St. 2d 13. He cannot raise this question for the first time upon appeal.

This question is raised by a challenge to jurors. The state of Ohio has provided the procedure in R. C. 2945.25 and 2945.26. Defendant was afforded an opportunity to test this question in the trial court. He did not avail himself of it, hence he waived it.

The first assignment of error is not well taken. The test has been laid down by the United States Supreme Court in *Brady* v. *United States* (1970), 397 U. S. 742, 753, 90 S. Ct. 1463, 1471.

The test is: Was the confession free and voluntary?; that is, was it extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by any exertion of any improper influence?

We have read and reread the testimony of defendant and Mrs. Helen Bandy, secretary in the office of the prosecuting attorney who took the statement of defendant in shorthand, and we are unable to find where the *charge* has been made that the confession was *not* free and voluntary. The most that defendant claims is that neither his parents nor a lawyer was present. Defendant said further that he was tired, scared and worried. The record shows that he was given the proper warnings and he signed a

written waiver of them. There is no claim on the part of the defense that there were any threats, violence, or promises, direct or implied, however slight, nor was any improper influence extended in connection with the giving of the confession by defendant.

The fourth assignment of error is without merit. The record amply supports the defendant's guilt of the offense with which he is charged, a "purposeful" homicide, a corpus delicti and a robbery.

Each party to a conspiracy is criminally responsible for all acts done in furtherance of the conspirational design. The agreement between a third person and defendant to rob the victim and share the proceeds constituted a conspiracy to rob. The act of defendant in jerking the victim from the car, the directing of traffic away from the scene while the robbery was in progress, the possession of the murder weapon, and the *offer* to dispose of it after the commission of the felony murder were sufficient to prove the corpus delicti of the murder and robbery and the purpose with which the act was done. See *State* v. *Doty* (1916), 94 Ohio St. 258.

We now come to consider the fifth assignment of error. In the confession, defendant admitted the facts, testified to by Barbara Bloomfield, which is the subject of this assignment of error. Defendant's confession reads, in part, as follows:

"* * * Who was in the bar with you?

"A. Paul.

"Q. Only Paul?

"A. Yes. Then Maurice and Bobby came in.

"Q. They did come in the bar?

"A. Yes. Paul went outside to get them and then they came in the bar.

"Q. When was the first mention made of going down to Fourth and Sinton?

"A. After Maurice and them came in the bar.

"Q. Who suggested going down to Fourth and Sinton?

"A. I think it was Paul.

"Q. Paul Dyer?

"A. Yes. Paul, Maurice and Bobby was all talking about it.

"Q. Why did they want to go down to Fourth and Sinton?

"A. We were going to get some money off that guy.

"Q. How was you going to get money off this fellow?

"A. I don't know how they had planned to. Just hit him a couple times.

"Q. In other words, you were going to take it by force?

"Mr. Howland: Objection.

"The Court: Overruled.

"Q. You may proceed.

"A. Yes.

"Q. Did you have any reason to believe he had a large sum of money on him?

"A. Maurice and one of them said he had a roll of money in his sock. Left sock or something like that.

"Q. Did you see Maurice take any money off the man?

"A. No, sir.

"Q. Did you see Bobby McClary take any money off the man?

"A. No, sir."

In the sixth assignment of error defendant assigns two errors: (1) That the trial court committed prejudicial error in permitting the prosecution to put in evidence other crimes under R. C. 2945.59, and (2), in failing to instruct the jury as to the purpose for which it was received. It is proper to introduce evidence of like acts under R. C. 2945.-59. Defendant contends further that the trial court should have instructed the jury of the purpose for which this evidence was received. We find no error in either branch of this assignment of error. In the first place, defendant made a motion for a mistrial, which he frequently did, but in order to preserve this question it was necessary for defendant to request the court to limit the application of this evidence to the case. Upon reading R. C. 2945.59 we find no requirement that the court limit the effect of evidence introduced under this section with or without a motion by defendant. The defendant, having made no motion to limit

the effect of this evidence, did not properly preserve the question. We are of the opinion that if defendant had moved the court to limit the effect of the evidence the court would not have been required to do so under the provisions of this statute. Nothing in this statute requires the court to state for what purpose such evidence is received. In fact, the General Assembly said "notwithstanding that such proof *may* show or *tend* to show the commission of another crime of defendant." (Emphasis added.)

We are of the further opinion that even if the trial court was required to limit the application of evidence introduced under R. C. 2945.59 it met the objection of defendant when it charged the jury during the reception of evidence as follows:

"The Court: Ladies and gentleman, the court wants to inform you that during the cross examination of the defendant, certain questions were asked of him which did not bear directly on the offense for which he's being tried today and the court permitted these questions to be asked and him answer them, merely for the purpose of testing his credibility as in the case of any other witness who takes the stand. You are not to consider these questions and answers to have a direct bearing on the issues in this case but rather as to the weight to be given his testimony. In order to have sufficient time for counsel to prepare argument the court will adjourn until 1:00 at which time arguments will begin."

In the general charge, the court said:

"* * * There is evidence that the defendant may have committed an earlier act similar to that charged in this case. If you find this to be true, such evidence has a limited purpose. You may consider it only to determine the state of mind, intent or purpose of the defendant, if you find from other evidence that the defendant did commit the act with which he is now charged. It must not be considered for any other purpose * * *."

We believe that defendant is urging a question that is not borne out by the facts in assigning the seventh assignment of error.

In withdrawing from a conspiracy one would have had

to have been involved in a conspiracy in the first place. We have cited ample facts for us to determine that defendant was part and parcel of the conspiracy to rob the victim. Since we have held that defendant was involved in the robbery, let us examine the facts as to whether there was a withdrawal or not. Defendant helped ''jerk'' the victim out of the car. While the robbery was in progress and while the victim was calling for help defendant was standing in the street directing traffic that was stopping to see what the commotion was. Defendant told the drivers of the automobiles to go on and that everything was ''okay.'' Paul, who wielded the knife, walked with the defendant to Stu's Bar. He and Paul walked into the bar and defendant told the bartender that if anyone came in looking for them the bartender was to say that they had been there all evening.

While defendant and Paul Dyer were walking toward the bar he told defendant that he had ''stuck'' the victim with a knife. Paul was talking about getting rid of the knife. Defendant *offered* to get rid of the knife for him.

While defendant and his confederates were sitting in the bar drinking beer after the commission of the homicide defendant asked ''how much money they got off of him.'' Bobby and Maurice said ''a dollar, just a dollar.''

Evidence was introduced that in the evening previous to the one on which the homicide occurred defendant and Paul Dyer robbed another person of $15 and split the proceeds. One of the purposes of R. C. 2945.59 is to prove defendant's motive or intent, the absence of mistake or accident on his part or defendant's scheme, plan or system of doing an act when such evidence is material. Defendant was no stranger to such proceedings. A person who encourages the commission of an unlawful act cannot escape responsibility by quietly withdrawing from the scene. The influence and effect of his acts and encouragement continue until he renounces the common purpose and makes it plain to the others that he has done so and that he does not intend to participate further. Defendant did not renounce his participation in the offense but aided in its commission and then offered to dispose of the murder weapon.

In connection with construction of R. C. 2945.59 see opinion of Schneider, J., in *State* v. *Moorehead* (1970), 24 Ohio St. 2d 166. Cf. *State* v. *Eaton* (1969), 19 Ohio St. 2d 145.

Defendant claims error intervened when the trial court did not charge on the lesser included offenses of manslaughter, assault with intent to rob and assault and battery.

The rule which the Supreme Court has laid down for us to follow is contained in the first paragraph of the syllabus of *State* v. *Muskus* (1952), 158 Ohio St. 276. It states:

"Murder in the first degree in the perpetration of a robbery may include the lesser offenses of murder in the second degree and manslaughter, and where, in the trial of a defendant for murder in the first degree in the perpetration of a robbery, there is substantial evidence tending to support a charge of murder in the second degree or manslaughter, the court should charge the jury on murder in the first degree and on the included lesser offenses. (*Bandy* v. *State,* 102 Ohio St., 384, approved and followed.)"

We have reviewed the evidence and have set it forth in detail in this opinion. We are of the view that defendant is guilty of a felony murder, or he is guilty of nothing. We will not extend this opinion by repeating the facts hereinbefore set forth. Defendant admitted "jerking" Samuel out of the car. A witness for the prosecution stated that he saw two men dragging a man out of a car. Defendant admitted that he directed traffic away from the scene while the fighting and homicide was taking place. He took the murder weapon from the knife wielder to dispose of it, but was arrested before he got rid of it. He nonchalantly walked to several bars and drank beer with Paul Dyer after Paul had killed Samuel. He inquired of the two younger boys as to how much did "*we*" get. He wanted money with which to go to California. There is ample evidence to show that the four went out to rob Samuel. The information that came to the robbers that defendant carried his money in his left sock was borne out by the fact that both shoes of the victim had been removed as was the *left* sock.

In our system of jurisprudence the defendant is not

limited or confined to a literal plea of not guilty. He may interpose any pertinent defense in the evidence, relying either upon the evidence of the state or upon the evidence that he himself might tender to support his defense, or upon both, however numerous his defenses may be. Among the very common defenses are those of alibi, self-defense, insanity, accident, drunkenness, and any other defense which the defendant sees fit to interpose which the law might recognize as a proper and adequate defense. *Bandy* v. *State* (1921), 102 Ohio St. 384, 387.

The above is the standard set by the Supreme Court for us to apply in considering this assignment of error. After analyzing the evidence introduced by the state and the defendant, we are unable to state that defendant presented a defense. Defendant does not deny he was present when the plans were made, does not deny his participation in the robbery, does not deny that he agreed to get rid of murder weapon, does not deny his agreement to participate in the fruits of robbery. He does not claim that he was drunk, insane or that the homicide was an accident. In fact, defendant confessed to his participation in the murder. What is his defense? On analysis it is apparent that he offered none. The trial court is required to charge the jury on the various questions developed by the evidence. Charges on the lesser included offenses of first degree murder are not given automatically. There must be some basis for giving them. There was none here. This being so, there was no evidence introduced which would lower the degree of the offense. Such being the state of the record, the trial court was not in error when it refused to charge on the lesser included offenses.

Every essential element of the crime of first degree murder is present. In the felony class of homicide, which occurs in the perpetration, or attempt to perpetrate, any rape, arson, robbery or burglary, the enormity and turpitude of the criminal act in which the offender is engaged at the time supplies the element of the deliberate and premeditated malice. *Robbins* v. *State* (1857), 8 Ohio St. 131, 177. The killing could not have been the result of an accident. It could only have been the result of design. Under

the undisputed evidence, the knifing was done deliberately and premeditatedly, with the specific intent to kill Samuel or to render the victim incapable of defending himself while being robbed. In either event, it is first degree murder.

The rule to apply in determining whether the trial court should charge on lesser included offenses has recently been enunciated by the Supreme Court. In *State* v. *Nolton* (1969), 19 Ohio St. 2d 133, 135, Justice Schneider, speaking for the court, said:

"The formulation of a new rule, therefore is necessary:

"If the evidence adduced on behalf of the defense is such that if accepted by the trier it would constitute a complete defense to *all* substantive elements of the crime charged, the trier will not be permitted to consider a lesser included offense for the reason that an unreasonable compromise would be invited on the state's evidence.

"On the contrary, if the trier could *reasonably* find against the state and for the accused upon one or more of the elements of the crime charged and for the state and against the accused on the remaining elements, which by themselves would sustain a conviction upon a lesser included offense, then a charge on the lesser included offense is both warranted and required, not only for the benefit of the state but for the benefit of the accused."

The prosecution proved a robbery, a homicide in connection therewith, that defendant was an aider and an abettor, and that a conspiracy existed.

Under this state of the record, and applying the above rule thereto, we are of the opinion that the trial court was correct in refusing to charge on the lesser included offenses.

Justice Schneider made the following observation in *State* v. *Moorehead* (1970), 24 Ohio St. 2d 166, 170.

"It is impossible to take a cross section of a man's mind so as to reveal his innermost thoughts and intentions. These must be shown by circumstances. The evidence outlined above constitutes an inescapable web of circumstances which admits of no other reasonable explanation

than that all the elements of the crime of murder during the commission of a robbery are present."

We believe that the above statement is relevant, germane and dispositive of this issue.

We believe that the ninth assignment of error is without merit. There is no evidence in the record that defendant was an accessory after the fact. Defendant was privy to all of the plans and the consummation of the plans by the co-conspirators. Therefore there was no error on the part of the trial court in refusing to submit the special instruction tendered by defendant.

The common-law rules as to accessories after the fact do not prevail in Ohio. *State* v. *Lingafelter* (1908), 77 Ohio St. 523. Whenever and wherever the General Assembly has deemed it necessary to penalize acts which are done or performed after the commission of the principal offense, but in furtherance thereof, it has enacted statutes to meet the case and such acts are made substantive offenses, as distinguished from those which constitute the relation of accessory after the fact as recognized at common law.

In considering the tenth assignment of error we apply the following test: Did the remarks of the assistant prosecutor naturally induce the jury to judge the case by considerations not presented in, or suggested by, the evidence? The remarks of the prosecuting attorney must be prejudicial to the defendant in order to be made the basis for a new trial. This question was ruled upon by the trial court in its ruling and defendant's motion for a new trial. The ruling of the trial court on the motion for a new trial will not be disturbed unless that court abused its discretion. We find no abuse of discretion in this regard.

We find no prejudicial error among those assigned and argued. Therefore, the judgment of the trial court will be affirmed.

*Judgment affirmed.*

ABELE, P. J., concurs.
STEPHENSON, J., concurs in the judgment only.