The STATE of Ohio, Appellee,

v.

LaFRENIERE, Appellant.

[Cite as *State v. LaFreniere* (1993), 85 Ohio App.3d 840.]

Court of Appeals of Ohio,
Lake County.

No. 91–L–070.

Decided April 2, 1993.

*Steven C. LaTourette*, Lake County Prosecuting Attorney, and *Geoffrey W. Weaver*, Assistant Prosecuting Attorney, for appellee.

*Leo J. Talikka* and *Kirsti S. Talikka*, for appellant.

CHRISTLEY, Judge.

This appeal has been taken from a judgment of the Lake County Court of Common Pleas. Following a protracted jury trial, appellant, Aurel LaFreniere, was found guilty on one count of murder. Under this count, the jury also found that appellant had possession of a firearm while committing this offense. The trial court then sentenced appellant to an indefinite term of fifteen years to life on the murder charge, to be preceded by a definite term of three years for the firearm specification.

Appellant's conviction was predicated upon an incident which occurred at his residence in Painesville, Ohio, on the morning of March 5, 1991. During this incident, the victim, Edward Wojiechowski, was shot once in the head and died soon thereafter. At trial, conflicting testimony was presented as to the events which preceded the shooting, as well as how the shooting itself actually occurred. The following is a synopsis of those events about which the testimony of the various witnesses was essentially in agreement.

On the evening of March 4, at approximately 9:00 p.m., appellant visited a small tavern in Painesville. Over the next three hours, appellant had a number of drinks, played a few games of pool, and spoke to a number of the patrons. At approximately 10:30 p.m., the victim entered the tavern with his friend, Randy Evans. Like appellant, the victim and Evans had a number of drinks and spoke to the patrons who were sitting at the bar.

Although they had never met before, appellant and the victim spoke to each other during the evening. This conversation continued, on and off, until the tavern closed at approximately 12:00 a.m. At that time, the victim and Evans agreed to accompany appellant to his residence. Before leaving the tavern, the three men purchased a twelve-pack of beer to take with them.

The three men drank beer at appellant's residence for approximately one hour. Then, the men decided to drive to Cleveland, using the victim's car. While it is uncertain whether they made any stops along the way, they eventually went to the apartment of Cindy Mullikin, another friend of the victim. There, the victim and Mullikin smoked cocaine. Although he declined to "do" any drugs, appellant

talked to Mullikin throughout his stay at the apartment. Sometime during this conversation, appellant and Mullikin exchanged addresses.

After approximately two hours at Mullikin's apartment, appellant told the victim and Evans that he wanted to go. The victim and Evans eventually agreed, and the three men drove back to appellant's residence in Painesville.

As to the events which occurred upon their arrival at appellant's residence, only two witnesses, appellant and Evans, were able to testify during the trial. Testifying on behalf of the state, Evans stated that while they were at Mullikin's apartment, appellant had been aggressive in attempting to talk to Mullikin. Since these actions had made Mullikin feel uncomfortable, the victim had told appellant to leave her alone. Then, during the drive back to Painesville, appellant and the victim had argued about Mullikin.

According to Evans, once the men had arrived back at appellant's residence, they began to drink more beer in the kitchen. Then, after the victim left the kitchen to go to the bathroom, appellant started to look through one of the cupboards. Turning to Evans, appellant stated that he had been unable to find certain money that he had left in the cupboard, and that he thought the victim had taken it. Even though Evans tried to tell him that was not the case, appellant went upstairs.

Evans further testified that after making at least two trips upstairs, appellant came back downstairs and stood in the hallway leading to the bathroom. When the victim left the bathroom, appellant asked him about the money. After the victim denied having it, appellant yelled at him and took a gun from his pants. Pointing it directly at the victim, appellant walked toward him, and then shot him when they were approximately one foot apart.

Evans also claimed that once the shot had been fired, he wrestled the gun away from appellant. After appellant determined that the victim was dead, Evans told him to call the authorities. While appellant was doing this, Evans took the victim's car keys from his pocket and then left the residence. Evans admitted that as he was driving away, he saw the police arrive at appellant's residence, but decided not to return.

After hiding the murder weapon, Evans contacted a public defender the following day. Once this attorney had made a deal with the prosecutor, Evans agreed to give a statement to the police. As part of this statement, Evans told the police the location of the murder weapon.

During his testimony, appellant gave a significantly different version of the shooting. According to him, after they came back from Mullikin's apartment, Evans and the victim started to alternate going into the bathroom. Believing that they were smoking marijuana in the bathroom, appellant told Evans and the

victim to leave. Once they had done so, appellant went upstairs to his bedroom. Although he heard tapping downstairs, he turned on his television and began to go to sleep.

A short time later, appellant was awakened by noises coming from downstairs. Grabbing his gun, appellant then went down the steps and saw Evans looking through certain papers which he had left in the kitchen. Upon noticing appellant, Evans told him that "they" wanted the remainder of his money. Keeping his distance from Evans, appellant went into the kitchen and closed one of the cupboards. After doing this, he moved toward the hallway which led to the downstairs bathroom.

Appellant further testified that as he continued to watch Evans, he heard a noise emanating from the end of the hallway. Even though he could not see because of the darkness, appellant turned in that direction and pointed the gun. He claimed that at that same time, he was pushed in the back and then struck across the left side of his face. As appellant was falling into the wall, Evans wrestled the gun from him.

Appellant also stated at trial that as a result of the punch and the fall, he became dizzy for a short period of time. When he regained his senses, he saw the victim lying at the end of the hallway and realized that he had been shot. Before leaving the residence with the gun and the victim's car keys, Evans told appellant that "they" had shot the victim during the scuffle for the gun. Appellant then called the police as Evans was leaving.

In addition to Evans and appellant, the county coroner also testified. As part of his testimony, the coroner stated that the victim had been shot almost directly between the eyes, and that the bullet had travelled through his skull at a forty-five degree angle. Expert testimony also established that the gun had been approximately twelve inches away from the victim when it had been fired.

During his cross-examination of appellant, the prosecutor asked whether appellant had ever pointed a gun at a person as a civilian. When appellant answered affirmatively, the prosecutor sought to question him as to three incidents in which he had allegedly pointed a gun at three different persons. After appellant's counsel objected, the trial court ruled that such questions were permissible.

The prosecutor then asked one question about each alleged incident. After appellant specifically denied that he had been involved in any of the incidents, the trial court instructed the jurors that they should not draw any inferences from the prosecutor's questions.

At the conclusion of the evidence, appellant moved the trial court to instruct the jury on the defenses of accident and self-defense. Concluding that an

instruction on both defenses would be inconsistent, the trial court found that the evidence supported only an instruction on the defense of accident. The court also rejected appellant's request for an instruction on the defense of "blackout." This latter request had been made in a pretrial motion concerning jury instructions. Moreover, at the close of the instructions to the jury, appellant again argued that an instruction should have been given on these matters.

After his sentence was imposed, appellant moved for a new trial. As grounds for the motion, appellant cited the court's evidentiary rulings and its failure to instruct on the defense of self-defense. The trial court denied this motion without a hearing.

In appealing this conviction, appellant advances the following six assignments of error:

"1. The trial court erred in refusing to give requested instructions and by failing to adequately and correctly instruct the jury: A. On the issue as to self-defense; B. On the issue as to whether the defendant-appellant was under a duty to retreat; and C. On the law on blackouts in Ohio.

"2. The failure of the trial court to adequately instruct the jury on an essential element of the appellant's defense was plain error within the meaning of Rule 52(B) Ohio Rules of Criminal Procedure.

"3. The trial court erred as a matter of law by permitting inadmissible evidence to be introduced at trial.

"4. The defendant was denied a fair trial by reason of improper arguments by the prosecuting attorneys during the case and during closing arguments.

"5. The verdict finding the defendant guilty of murder is against the manifest weight of the evidence and is otherwise contrary to law.

"6. The trial court erred in not granting the defendant-appellant a new trial, pursuant to Criminal Rule 33."

The first two assignments in this appeal pertain to the merits of the trial court's refusal to instruct the jury on the defense of self-defense. Under his first assignment, appellant submits that the court erred in concluding that it would have been inconsistent to instruct the jury on both the defenses of accident and self-defense. Appellant further contends that his own testimony supported an instruction on self-defense.

As the state correctly notes, the Ohio Supreme Court has specifically answered the first issue raised by appellant. In *State v. Champion* (1924), 109 Ohio St. 281, 142 N.E. 141, the defendant was charged with murder in the first degree. At the conclusion of the evidence, the defendant moved for an instruction on both

accidental homicide and self-defense. In concluding that such a request could not be granted, the court held:

"The very fact that requests were asked both on accidental homicide and self-defense, under the same evidence, presents a most peculiar paradox—a direct contradiction in terms and truth. Self-defense presumes intentional, willful use of force to repel force or escape force. Accidental force or shooting is exactly the contrary, wholly unintentional and unwillful. It is similar to a person saying in one breath, 'I was insane at the time of the homicide,' and in the next breath, 'I shot in the exercise of my right of self-defense, with reasonable grounds therefor, as they appeared to me.'" *Id.* at 286–287, 142 N.E. at 143.

Although this precedent is nearly seventy years old, the courts of this state continue to find it controlling on this issue. See, *e.g., State v. Lytle* (Aug. 19, 1988), Highland App. No. 632, unreported, 1988 WL 92413; *State v. Orr* (Apr. 17, 1986), Cuyahoga App. No. 50374, unreported, 1986 WL 4668.

Notwithstanding this precedent, appellant contends that the rule in *Champion* has been limited to the facts of that case. Specifically, he contends that certain courts have held that under some circumstances, an instruction on both defenses may be warranted. In support of his position, appellant cites *State v. Armbrust* (App.1941), 35 Ohio Law Abs. 554, 42 N.E.2d 214.

In *Armbrust,* the defendant's conviction for manslaughter was based upon a stabbing incident. Before the common pleas court, the defendant argued that although he had drawn the knife in self-defense, he had not purposely thrust it into the victim. Rather, he claimed that somehow the victim had fallen on the knife which he, the defendant, had been holding. As to the issue of the jury charge, defense counsel requested a specific instruction on accident rather than self-defense.

The trial court was apparently more impressed with the events leading up to the stabbing than with the stabbing itself, because the gist of its instructions focused on the self-defense aspect of defendant's initial actions. The trial court's language regarding both defenses was as follows:

" 'As I have said to you, if a man purposely uses a deadly weapon upon another, one calculated to produce death, the intent to wound or kill may be inferred from the use of the weapon, and the manner in which it was used; but whether such person had such intent or whether he did not is a question of fact for the determination of the jury from all the facts and circumstances in evidence.'

" * * *

" 'Now, it is contended by the defendant that he did not purposely use the knife or thrust the same voluntarily into the person or body of Charles Mays, but he does contend that in drawing this knife he drew the same in protection of himself.

That question, together with all other questions of fact, are for your determination as I have said from all the facts and circumstances in evidence.'" *Id.* at 558–559, 42 N.E.2d at 217.

In ultimately concluding that this minimal jury instruction on the defense of accident had been appropriate, the appellate court noted that a "defendant's possession and drawing of a weapon may be in self-defense, but the actual infliction of the mortal wound may be an accident." *Id.* at 558, 42 N.E.2d at 217.

Although the *Armbrust* court was able to infer from the above jury charge that an instruction on accident had been given, we are somewhat less convinced. However, if in fact the foregoing language constituted a specific charge on accident, this court does not believe that the foregoing statement of the appellate court in *Armbrust* conflicts with the holding in *Champion.*

Specifically, we agree that even though a weapon was originally drawn in self-defense, it does not necessarily mean that it was ultimately used in such a manner. Under such circumstances, only an instruction on the defense of accident would be warranted as to the actual act causing death. Additional instruction as to the nature of the events leading up to that event would seem to be merely permissible rather than mandatory.

Thus, we do not interpret *Armbrust* as standing for the proposition that an instruction on both defenses can be given in reference to the actual act which caused the death. The *Armbrust* court merely held that the given instruction on the defense of accident, which related to the actual stabbing, was sufficient under the circumstances; and that the concurrent instruction given on self-defense and concerning the events leading up to but not involving the ultimate act of stabbing did not constitute error.

In other words, the concern of the appellate court in *Armbrust* was whether the presence of the self-defense instruction negated the ability of the jury to consider the accident instruction preferred by the defendant. It found it did not. The *Armbrust* court simply found that the self-defense charge was not error under the circumstances. It was not a mandate for such a charge.

Appellant also cites this court's decision in *State v. Brady* (1988), 48 Ohio App.3d 41, 548 N.E.2d 278. However, our opinion in that case merely dealt with the issue of whether the facts supported an instruction on the defense of accident.

As noted above, during his testimony, appellant stated that when he first heard the noises downstairs, he grabbed his gun and went to investigate. Under appellant's version of the facts, it is clear that at this point he was acting in a manner consistent with self-defense. Moreover, when he pointed the gun down the hallway after hearing the second noise, he was still acting in a mode of self-defense.

However, according to the appellant, the gun did not fire *until* he had been attacked from behind. This testimony is contradictory to the concept of the *intentional* use of force required for self-defense. Instead, it supports only the proposition that appellant did not purposely fire the gun. Thus, pursuant to *Champion,* an instruction on self-defense was not warranted as to the actual act of shooting, even under appellant's version of the incident. From this, it also follows that the facts of this case did not require an instruction on the duty to retreat in relation to the actual shooting itself. Per *Armbrust,* however, such an instruction on the events leading up to the shooting would not have been error, even though it was not mandatory.

■ Under this first assignment, appellant further argues that the trial court erred in denying his request for a jury instruction on the doctrine of blackout. Specifically, he contends that such an instruction was warranted because his own testimony established that he was rendered unconscious for a short period upon being struck from behind.

Although the doctrine of blackout has been applied in many civil and criminal cases, few courts have attempted to define it. For the basis of the doctrine, modern courts have cited R.C. 2901.21. Subsection (A) of this statute states that a defendant cannot be found guilty of an offense unless it is shown, *inter alia,* that his liability is predicated upon conduct which constitutes a voluntary act, and that he had the requisite mental state in committing the act. Subsection (C)(2) then provides that "[r]eflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition, are involuntary acts."

In addition to the statute, many courts have simply referred to the standard jury instruction for blackout to define the doctrine. See *State v. Murray* (Apr. 18, 1990), Lorain App. No. 89CA004648, unreported, 1990 WL 50165. The instruction provides:

"Where a person commits an act while unconscious as in a (coma) (blackout) (convulsion) due to (heart failure) (disease) (sleep) (injury), such act is not a criminal offense even though it would be a crime if such act were the product of a person's (will) (volition)." 4 Ohio Jury Instructions (1989) 62, Section 409.05.

In the majority of cases in which blackout has been invoked, the defendant has attempted to establish that he was unconscious at the time the act was committed. See, *e.g., Murray.* As a result, the term "blackout" has usually been referred to as being synonymous with unconsciousness. Yet at least one appellate court has held that "blackout" can refer to the state in which the individual cannot recall actions he did while he was conscious and functioning. *State v. Griffin* (Jan. 19, 1988), Franklin App. No. 86AP759, unreported, 1988 WL 4651.

■ Historically, blackout has been deemed an affirmative defense which the defendant must prove by a preponderance of the evidence. *State v. Myers* (App.1959), 82 Ohio Law Abs. 216, 164 N.E.2d 585. This characterization of blackout was later followed by the Second Appellate District in *State v. Robinson* (May 27, 1986), Montgomery App. No. 9547, unreported, 1986 WL 6109. In support of this holding, the *Robinson* court emphasized that blackout was similar to the defense of insanity, in that it is based upon a matter of which only the defendant has knowledge.

A review of appellant's testimony shows that he made only three references to his state of mind immediately after he was struck. The first occurred during direct examination:

"Q. What happened to you when you were thrown up against the wall?

"A. Prior to being thrown up against the wall, I don't remember anything for a few minutes, *I was dizzy.* I remember a crunch against the wall. I remember looking up. He had the gun and he was pointing it at me and he said, 'We shot him. We killed him.'" (Emphasis added.)

The second and third references to his mental state occurred during the state's examination:

"Q. What was the noise?

"A. I don't know what the noise was. I heard a noise.

"Q. Okay.

"A. When I heard the noise I turned around like this here and put the gun in this hand and started to bring it up. That is when I got hit from behind. I—my knees gave away. *I remember sort of twirling like being unconscious.*

"* * *

"Q. Now, the weight, the pressure, did that ever move you from your location in the center hallway?

"A. I don't remember.

"Q. You don't know if it went off your side?

"A. No, because I was—*everything just went out for a second, a couple, whatever time it was.*" (Emphasis added.)

In its brief, the state asserts that the record does not contain any evidence indicating that appellant ever lost consciousness after he was struck. This assertion is technically incorrect. While appellant's description of his mental state varied from "dizzy" to "twirling," he did state during cross-examination that "everything just went out" for a short period. Moreover, appellant further testified that he could not recall seeing or hearing the fatal shot. Thus, when

considered in a light most favorable to appellant, his testimony was sufficient to raise the possible inference that he was unconscious for a short period immediately after he was struck from behind. The fact that this testimony may be self-serving is irrelevant to the need for an instruction.

■ As part of his discussion of the blackout question, appellant maintains that the lack of a blackout instruction hindered his chances of prevailing under his accident theory. The record before us supports this particular argument. Appellant never testified that the gun accidentally fired during his struggle with Evans; instead, his sole theory was that the gun somehow went off while he was unconscious. Without the requested instruction, the jury could not have known that blackout was a viable defense. This, in turn, had to affect the viability of appellant's accident defense in the eyes of the jury, since this defense was contingent upon the position that the shot was fired during the period in which he claimed to be unconscious.

In response to this argument, the state contends that a specific instruction on blackout was unnecessary because the substance of such an instruction was included in the general charge to the jury. Specifically, the state notes that the trial court instructed the jury that in order to find appellant guilty, it had to conclude that he had had the "conscious objective" of causing the victim's death. The trial court made this statement in defining the term "purposely."

As to this point, we emphasize that the trial court never specifically stated that appellant had to be conscious at the time of the shooting; thus, the jury had to infer this from the court's instruction. While there is no reason not to believe that the jury did just that, this is not the same as instructing on the affirmative defense of blackout. If appellant's requested instruction had been given, the jury would have been required to specifically consider appellant's testimony and its credibility. Without the instruction, the jury merely considered the evidence as a whole.

In determining that the trial court erred in failing to give the blackout instruction, this court is not rendering a decision on the credibility of appellant's testimony. We are merely indicating that the record contains some credible, competent evidence supporting a finding of blackout. Under these circumstances, an instruction on the affirmative defense of blackout had to be given. *State v. Payne* (1957), 104 Ohio App. 410, 5 O.O.2d 87, 149 N.E.2d 583. Thus, appellant's first assignment is well taken in part.

■ Under his second assignment, appellant argues that the failure of the court to instruct the jury on self-defense constituted plain error. Since appellant clearly objected to the court's actions, the plain-error doctrine is not applicable. The second assignment is likewise without merit.

.

As was noted above, while cross-examining appellant, the prosecutor attempted to question him as to three previous incidents in which he had allegedly pointed a gun at someone. Overruling appellant's objection to the line of questioning, the trial court accepted the state's argument that the proposed testimony was admissible because it showed the absence of a mistake or accident in pointing the gun at the victim. In his third assignment, appellant contends that the court's ruling was erroneous because it violated the general rule concerning the admissibility of prior bad acts.

As both parties aptly note, the question raised in this assignment is governed by Evid.R. 404(B):

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." [1]

As a general proposition, the Ohio Supreme Court has held that before evidence as to prior acts can be admitted, the prior act must be "inextricably related" to the charged crime. *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 18 O.O.3d 482, 415 N.E.2d 261. As to when such evidence is admissible to show an absence of mistake or accident, the court has held that "it must be shown that a connection, in the mind of the defendant, must have existed between the offense in question and the other acts of similar nature." *State v. Burson* (1974), 38 Ohio St.2d 157, 159, 67 O.O.2d 174, 175, 311 N.E.2d 526, 528–529.

Applying the foregoing standard, the Sixth Appellate District has held that prior acts concerning the shooting of a gun were admissible in a case in which the defendant was charged with felonious assault involving a firearm. In *State v. Hartfield* (Nov. 18, 1988), Lucas App. No. L–87–323, unreported, 1988 WL 123646, the charges against the defendant were based upon an incident in which she reached inside her purse, placed her hand upon the gun, and then discharged it. At trial, the defendant raised the defense of accident. In response to this, the state sought to show that appellant had committed the same act earlier.

In concluding that evidence concerning the prior act was admissible, the Sixth District emphasized that the two acts had been very similar. Based upon this,

---

1. As part of his arguments concerning the prior acts, appellant emphasizes that the charges stemming from the three incidents were subsequently dismissed. While appellant failed to present any evidence establishing this fact, we note that whether he was actually convicted of a crime is irrelevant to the question of whether the state should have been permitted to question him on the incidents. Evid.R. 404(B) specifically refers to evidence "of other crimes, wrongs, or acts." R.C. 2945.59 refers only to "acts," and has been interpreted to be consistent with the rule. See, *e.g., State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682.

the court held that the evidence tended to show that appellant had the same state of mind in both instances; *i.e.*, that she had intended to fire the gun.

In arguing that the trial court did not err in allowing evidence on the prior acts in this case, the prosecutor contends that *Hartfield* is controlling. However, without commenting upon the merits of *Hartfield,* this court notes that the prior acts in the instant case were not relevant to the specific question of whether appellant intended to fire the gun.

In *Hartfield,* the defendant discharged the gun in the same manner as she had in the prior act; thus, the prior act was relevant to the issue of whether the defendant intended to fire the gun. However, in the alleged prior acts in the instant case, appellant pointed but *did not fire* a gun at other persons. Thus, the prior acts in this case are inherently different from the charged offense.[2] Pursuant to this analysis, the prior acts were simply irrelevant to the question of accident; thus, evidence concerning them was inadmissible under Evid.R. 404(B). The trial court accordingly erred in allowing the prosecutor to question appellant about these acts.

Moreover, a review of the trial transcript supports the conclusion that this error was prejudicial. The prosecutor was allowed to ask only one question as to each incident; and after appellant denied each incident, the questioning was stopped. The trial court then admonished the jury not to draw any inferences from the questions. Yet, even given the limited extent of the questioning, appellant was substantially prejudiced, as we believe that the court's instruction could not eliminate the image of appellant created for the jury by the prosecutor as a time bomb waiting to go off.

■ As part of this assignment, appellant also maintains that the trial court erred in allowing questions concerning certain aspects of his military career. During of his cross-examination of appellant, the prosecutor asked a series of questions pertaining to appellant's use of weapons in the military and whether he had ever killed another person while he was a Marine. The prosecutor also asked a series of questions concerning certain mental problems appellant had experienced as a result of his military career.

---

2. As to this point, this court emphasizes that the fact that the prior acts and the charged offense are different is not dispositive of the question of whether the evidence concerning the acts was admissible. The Supreme Court has consistently noted that the words "like" or "similar" do not appear in the statute or the rule. *Broom, supra; State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180. Thus, evidence of prior acts may be admissible even when the prior act is different from the charged offense. However, in this case, the three prior acts were inadmissible because they did not tend to show that appellant had not made a mistake in firing the gun.

Appellant asserts that the fact that the state asked these questions indicates that it had had access to his military service records. Citing the Privacy Act and the Freedom of Information Act, Section 552, Title 5, U.S.Code, appellant contends that the state's alleged access to this information was improper because he had not given the state permission. Based upon this, he argues that the trial court should not have permitted the state to pursue this line of inquiry.

Without addressing the merits of this argument, this court notes that appellant never objected to the state's questions on these matters. As appellant did not bring this *possible* error to the trial court's attention, he has waived his right to have this matter reviewed upon appeal. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Thus, this aspect of this assignment in without merit.

However, pursuant to the foregoing discussion, we conclude that the trial court erred in permitting the three questions as to the prior acts. Accordingly, appellant's third assignment is well taken in part.

■ During his closing argument, the state made specific comments as to the credibility of appellant's trial testimony. In addition to other numerous comments, the prosecutor characterized appellant's testimony as a "pack of lies." Under his fourth assignment, appellant contends that the prosecutor's comments constituted prosecutorial misconduct, which denied him his right to a fair trial.

Clearly, the prosecutor's comments were improper. DR 7–106(C)(4) of Ohio's Code of Professional Responsibility provides that an attorney cannot state his opinion as to credibility of a witness during the trial. This is especially true in the case of a prosecutor. See *State v. Rahman* (1986), 23 Ohio St.3d 146, 154, 23 OBR 315, 322, 492 N.E.2d 401, 409.

A review of the state's closing argument indicates that appellant failed to object to any of the prosecutor's improper comments. Normally, the failure to object would constitute a waiver of the alleged error. However, the Supreme Court of Ohio has held that a trial court must intervene *sua sponte* if counsel abuses his privilege during opening or closing arguments. *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563. This rule has been followed in the criminal context. See *State v. Carver* (1972), 30 Ohio App.2d 115, 59 O.O.2d 230, 283 N.E.2d 662; *State v. Baker* (Feb. 7, 1990), Lorain App. No. 89CA004542, unreported, 1990 WL 11719.

Moreover, the failure to object is not controlling if the misconduct constituted plain error under Crim.R. 52(B). The Supreme Court has stated that plain error will be found only if the outcome of the trial would have clearly been different but for the error. *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464.

This case turned almost entirely upon the jury's assessment of the credibility of appellant and Evans. Thus, any comment upon a witness's credibility was critical. The testimony of the two primary witnesses was riddled with inconsistencies. Moreover, the other evidence presented in this case supporting Evans's version of the firing of the gun was scarcely overwhelming.

Given the state of the record, it is certainly arguable that the prosecutor's statements, in and of themselves, would have altered the outcome of the trial. However, it is not necessary for us to address the merits of this particular issue in isolation. This court therefore concludes that when considered collectively, and in context, with the errors noted under the first and third assignments, the statements during closing arguments were clearly prejudicial. Thus, the fourth assignment also has merit.

Under his fifth assignment, appellant contends that the jury verdict was against the manifest weight of the evidence. In arguing that the evidence did not support a finding of guilty of the murder charge, appellant essentially contends that the testimony of the state's main witness, Evans, lacked any credibility. Furthermore, he submits that the evidence actually supports the finding that Evans was the one who shot the victim.

As a result of our holding under the first and third assignments, any discussion of the ultimate merits of the assignment has been rendered moot. Thus, pursuant to App.R. 12(A)(1)(c), this court deems it unnecessary to rule upon the issue raised under this assignment.

Under his sixth and final assignment, appellant submits that the trial court erred in overruling his motion for a new trial. As grounds for this motion, appellant cited the trial court's failure to give a jury instruction on the issue of self-defense. Moreover, appellant again challenged the trial court's ruling on the "prior acts" issue.

Each of these issues has been previously addressed in assignments one and three. Given our holding in these assignments, it follows that the trial court erred in denying appellant's motion for a new trial.

For the foregoing reasons, the judgment of the trial court is reversed and the cause is hereby remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

FORD, P.J., and NADER, J., concur.