OPINION
{¶ 1} Defendant-appellant, Jacob L. Martin, Jr., appeals from the judgment of the Franklin County Court of Common Pleas, whereby the trial court, pursuant to a jury trial, convicted appellant of one count of reckless homicide, a third-degree felony, with a firearm specification. For the following reasons, we affirm. *Page 2 
 {¶ 2} The Franklin County Grand Jury indicted appellant on one count of aggravated murder, in violation of R.C. 2903.01, with a firearm specification pursuant to R.C. 2941.145. The charge involved a December 2005 shooting incident that resulted in the death of Tamara Moore.
 {¶ 3} Appellant pled not guilty to the charge, and a jury trial ensued. At trial, plaintiff-appellee, the State of Ohio, amended the charge against appellant from aggravated murder to murder.
 {¶ 4} Yvonne Gardner, a police dispatcher for the Columbus Police Department, testified as follows on behalf of appellee. During the early morning hours of December 8, 2005, Gardner received a 911 call from appellant. Appellant indicated that "[s]omebody was playing with a gun" and "[s]omebody shot the[m]self accidentally" in the head. (Vol. II Tr. at 61.) Appellant clarified that he was referring to his girlfriend. Appellant stated that he was arguing with his girlfriend, and she was waving a gun at him. Appellant stated that he was trying to get her to stop waving the gun at him, and, ultimately, the gun fired.
 {¶ 5} Officer Arkadiusz Augustyniak testified that he went to appellant's residence after the 911 call. Ultimately, he placed appellant in a police cruiser. While in the police cruiser, appellant stated that his "girlfriend had obtained a gun earlier * * * during an argument." (Vol. II Tr. at 95.) On cross-examination, Officer Augustyniak testified that appellant also told him that he tried to grab the gun from his girlfriend.
 {¶ 6} Officer Terry Stuart also went to appellant's residence after the 911 call. Officer Stuart testified that he noticed Moore lying on the floor with a firearm by Moore's right hand. Moore had a gunshot wound on the left side of her head. *Page 3 
 {¶ 7} Paramedic Thomas Frederick testified that he went to appellant's residence after the 911 call. While at the residence, the paramedic heard appellant say "we got in an argument and she's back here and she accidentally shot herself." (Vol. III Tr. at 50-51.)
 {¶ 8} Martin Lewis is a forensic scientist from the Bureau of Criminal Identification and Investigation. Lewis testified that he tested gunshot residue on the hands of appellant and Moore. "Particles highly indicative of gunshot primer residue were identified on one of the samples from the hands of Tamara Moore." (Vol. III Tr. at 79.) In addition, "particles highly indicative of gunshot primer residue were also identified on one of the hands of the samples of [appellant]." (Vol. III Tr. at 79.) Lewis explained that "[a] positive finding on samples from somebody's hands means that that individual either fired or discharged a firearm, was in close proximity to a firearm when it was discharged or that they handled something that already had gunshot residue on it." (Vol. III Tr. at 79.) On cross-examination, Lewis verified that he had no opinion as to how the shooting occurred.
 {¶ 9} Moore's mother, Kathleen Moore-Bryce, testified as follows on behalf of appellee. On December 5, 2005, Moore-Bryce talked to her daughter by phone. Her daughter was crying because she and appellant were arguing. Moore-Bryce's daughter stated appellant "choked her and [appellant] said he choked her because [Moore] hit him." (Vol. III Tr. at 137.) Moore-Bryce received frequent calls from Moore when Moore fought with appellant.
 {¶ 10} Columbus Police Detective Jay Fulton also testified on behalf of appellee. Detective Fulton and Columbus Police Detective John Weeks interviewed appellant on *Page 4 
the day of the December 8, 2005 shooting. Appellee played a recording of the interview for the jury. In the interview, appellant made the following statements. Moore and appellant had been dating and shared a home. On December 8, 2005, appellant and Moore were arguing while at the house of a friend, Todd Dowell. They had been drinking. Moore and appellant returned home.
 {¶ 11} The interview then depicted the following.
 [APPELLANT]: * * * And me and her had been arguing and to make a long story short I was cussing at her and she went in my closet. I'm laying down with my kids at the time. I'm laying down with my daughter, my youngest daughter, and she grabs the gun.
 * * *
 All the kids are laying down in the bed with me. And [Moore is] on the phone with her mom and you know, because we had been arguing and I'd been cussing at her.
 DETECTIVE FULTON: What were you arguing about?
 [APPELLANT]: * * * [J]ust stupid stuff. I mean, * * * I said we was gonna split up and, you know, she was taking the split-up * * * rough or whatever. And she was just cussing me up to her parents. And I was just calling her bitches and stuff like that. And you know, next thing I know she went in my closet.
 DETECTIVE FULTON: Did it ever get physical * * *[?]
 [APPELLANT]: It did. She punched me in the eye right here. And the police came out yesterday. I didn't press charges against her. And today she had, you know, went for my gun. And you know, me and her had fought before. She got it out of the case. I didn't believe she was really gonna take it out of the case. * * *
 * * *
 [APPELLANT]: * * * I was wrestling to get the gun out of her hand and it goes off. She grabbed the gun and — *Page 5 
 * * *
 [APPELLANT]: * * * So when she gets it out of the case, you know, I jump up out the bed.
 * * *
 She standing to the left of the bed. I guess if I'm laying on the bed facing the wall she's standing to the left of the bed. So when I rush her to get the gun, me and her are fighting for the gun and then in the confusion, I don't know, the rest there is crazy. I'm trying to take the gun away from her, it's between me and her. * * * I never meant.
 DETECTIVE FULTON: Never meant what?
 [APPELLANT]: For the swing between us, the swing to her. I tried to take it out of her hands all the way. * * * I should have stopped her when I seen her grabbing it. * * *
 * * *
 She had [the gun] in her right [hand] and then we started grappling for it.
 * * *
 DETECTIVE FULTON: * * * Was she going to hurt herself, was she going to hurt you, was she going to hurt the kids, was she trying to make a point[?]
 [APPELLANT]: Sir, I said she's probably trying to make a point. But the point that she was trying to make I grappled for the gun because my kids and me were laying in bed. I wasn't trying to, you know, sit around and watch her wave a gun around to make a point. I was grappling for the gun.
 DETECTIVE FULTON: Where did you grab the gun?
 [APPELLANT]: Probably right around the handle part. The handle part and everything and just like fighting, you know, saying for position and grabbing it.
 * * * *Page 6 
 DETECTIVE FULTON: * * * [D]escribe to us as she was taking the gun out of the case?
 [APPELLANT]: She took it out the case and everything and she had it in her hands. But I don't — past that I don't know. I'm laying in bed with my daughter when I seen her doing that.
 DETECTIVE FULTON: How far along did she get before you jump up and go to action?
 [APPELLANT]: She got the gun all the way out before I got in action.
 * * *
 * * * I tried to * * * grapple with the gun and get in front of her and it went off. * * *
 * * *
 DETECTIVE WEEKS: It sounds to me what you're saying she's prone to violence.
 [APPELLANT]: Yes.
 * * *
 She's got knives before and came at me.
 * * *
 DETECTIVE FULTON: So you start smacking one another around?
 [APPELLANT]: No. I never touched her. Outside of getting my child undressed she's like you're not shit and I was like well bitch, f____ you. And she was like well you're not shit. I can't believe I'm with you. Well bitch, f____ you. And I got the kids undressed. I feel uncomfortable arguing in front of my kids. So we all laid down and she gets on the phone and she's like da, da, da.
 * * * *Page 7 
 * * * I didn't jump up off the bed until I seen that she had the audacity to pull it out of the gun case to try to grab it.
 * * * *Page 8 
 DETECTIVE WEEKS: How many gunshots were fired?
 [APPELLANT]: One. That's all.
 DETECTIVE WEEKS: Okay. And when the gun discharges and she falls to the ground, to the floor, who's got the gun in their hand?
 [APPELLANT]: Me.
 DETECTIVE WEEKS: You're left holding the gun?
 [APPELLANT]: Yes. From wrestling. Yes.
 DETECTIVE WEEKS: What do you do with the gun after she had fallen to the floor?
 [APPELLANT]: Dropped it immediately because I wrestled it out.
(Vol. III Tr. at 204-208, 212-213, 215, 218-221, 224-227.)
 {¶ 12} Mark Hardy of the Columbus Police Crime Lab tested the firearm used during the December 8, 2005 shooting incident. Hardy testified that the firearm could not be fired any other way than through the application of pressure on the trigger; there was nothing about the firearm that made "it more likely than others to go off unintentionally." (Vol. IV Tr. at 34.)
 {¶ 13} Hardy also tested soot on the sweater Moore was wearing and concluded that the sleeve of the sweater was "in contact with or close contact with the weapon at the time of discharge." (Vol. IV Tr. at 40.) Appellee showed Hardy a photograph of Moore's body after the shooting, and the photograph depicted "dark marks along the upper arm." (Vol. IV Tr. at 41.) Hardy testified that the marks in the photograph "could possibly be" "consistent with burns or soot deposits from close contact with the weapon *Page 9 
firing." (Vol. IV Tr. at 41.) Hardy testified that the dark mark on Moore's body "correspond[s]" with the soot on the sweater, and, therefore, such results establish that "[t]hey would be in the same approximate location." (Vol. IV Tr. at 42.)
 {¶ 14} Appellee showed Hardy another photograph of Moore's body after the shooting, and the photograph depicted "a dark mark on the lower left arm." (Vol. IV Tr. at 43.) Hardy testified that the mark "could possibly be" "consistent with either the burns or soot deposition in close contact with a weapon firing." (Vol. IV Tr. at 43.)
 {¶ 15} Next, appellee showed Hardy a photograph that depicted "a dark mark on the side" of Moore's head. Hardy testified that the mark was "consistent with soot deposition from contact or close contact with the discharge of a firearm." (Vol. IV Tr. at 43.)
 {¶ 16} Thereafter, appellee asked Hardy: "How close * * * would the sweater have been to [appellant's] head wound?" (Vol. IV Tr. at 47.) Hardy responded:
 Given the fact that one shot was fired, the weapon was in contact with or loose contact with the head at the time of discharge, assuming that the blue turtleneck and arm was folded at the time which would allow soot deposition in two places on the lower left arm and the mid arm of the left sleeve, the arm would have had to have been fairly close to the head at the time of discharge. Assuming * * * the residue on the arm is from the muzzle, the arm would have had to have been fairly close to the head because the muzzle was fairly close to the head. If we assume the soot has come from the cylinder gap then it would have been a little farther away from the head but still fairly close.
(Vol. IV Tr. at 47.)
 {¶ 17} The trial court then asked Hardy to approximate distances, and Hardy testified: *Page 10 
 The head wound I would say is most likely less than an inch in contact or loose contact so it's less than an inch. So we've got a weapon here near the head in contact with the head or very close contact with the head. If these came from the muzzle of the weapon then the arm would almost would have to have had been in contact with the head or close contact. If the soot deposition on the sleeve came from the cylinder area of the weapon because we're talking about an approximately four inch barrel then it would be approximately three and a half, four inches away, somewhere in that area.
(Vol. IV Tr. at 48.)
 {¶ 18} Dr. William Cox from the Franklin County Coroner's Office did an autopsy on Moore. Dr. Cox testified that he is a forensic pathologist and, in that capacity, determines, in part, the manner in which people die. Dr. Cox testified that Moore died from a gunshot wound to the head. Dr. Cox testified that "[t]he manner of death was homicide" and that the bullet entered the left side of Moore's head. (Vol. IV Tr. at 96.) Dr. Cox also testified as follows:
 Q. Was there anything * * * that the soot pattern [on Moore] was able to tell you about with regard to distance?
 A. Okay. First you know it's not hard contact. Now, hard contact means the muzzle of the weapon is placed right against the skin. The reason you know that, it didn't have black searing at the margins and it didn't have stellae tears. Because when that missile exits in that kind of configuration, the gases that are discharged go directly underneath the skin, expand the skin and you get these linear tears at the edge of the gunshot wound. We know that never transpired.
 We also know that there was no powder stippling. Powdered stippling is produced by the unburned powder grains which is what gives the missile its energy to move forward out of the barrel. And what they are are tiny pinpoint areas of abrasion. They have a reddish to reddish orange color. You can see those somewhere beyond ten millimeters which is about .04 inches. I believe that's about right. From the surface of the skin out to a point that varies. *Page 11 
It depends on who you read, but out to a point of 12 to 18 inches from the surface of the skin. And obviously as the end of the muzzle gets further and further away, the pattern, the stippling pattern gets greater and greater in diameter until it finally disappears. So we didn't see that.
 So what we know for certain here based upon the soot pattern, no powder tattooing. You know it was ten millimeters or under. * * *
 * * *
 Q. Going back to now the two marks on [Moore's] arm. Was there anything significant or was there any reason that they drew your attention?
 * * *
 [A.] * * * [W]hen the missile is discharged not only does soot come out at the end of the muzzle, but assuming this is the cylinder and this is the barrel, this is cylinder and this is the barrel, it comes out here. And what that told me is that when the deceased was — when the deceased was shot in some fashion the arm had to be up like this because that soot pattern is deposited almost in a V shape, in a linear V. * * *
 * * *
 * * * We call those defensive injuries. In other words, what the individual is doing is they're raising their arm up to ward off the bullets that are coming at them, the missiles that are coming at them, * * * they'll put their arm up trying to ward off the blows and the subwounds.
 * * *
 Q. What, if anything, makes this or your findings inconsistent with a self-inflicted wound?
 A. It was my understanding that the deceased * * * was right handed. * * *
 * * *
 * * * I had a hard time grasping how an individual could contort themselves with being right handed and getting a *Page 12 
near contact wound in the angle that we were getting and at the same time putting a soot like pattern on their left forearm, both the left forearm and the left arm. It just no matter — is it possible? I suppose it would be remotely possible. But is it probable, does it make common sense? The answer to that was no.
 Q. And Dr. Cox, is there anything about the body, and again, talking about the arm either being nearly in front of the face as you demonstrated or folded, is there anything about if the deceased had the weapon in her right hand?
 A. Yes.
 Q. Is there anything about the anatomy of the body that would make it difficult to get that arm around?
 A. If you stop and look at it, it just — just think that you got it, you know, basically you m[u]st have to be a contortionist to accomplish that kind of gunshot wound. The other thing please keep in mind is the abundant blood, et cetera, that you find on the left hand both this side and this side and the left forearm. When a head wound takes place, they bleed a great deal. What you would anticipate is that the blood would be, if the person is right handed, discharge the weapon you expect almost like a blow-back effect where it would come back onto the right hand both either the anterior surface or the dorsal surface and that was not the case here.
(Vol. IV Tr. at 88-95.)
 {¶ 19} On cross-examination, Dr. Cox testified that Moore had an alcohol level of .18 at the time of her death, and she was "under the influence of alcohol." (Vol. V Tr. at 8.) Dr. Cox also testified that alcohol "release[s] * * * inhibitions" that "allow emotions to be carried away." (Vol. IV Tr. at 113.) In addition, Dr. Cox testified that severe mental illness could "be a fact of consequence." (Vol. IV Tr. at 114.)
 {¶ 20} Next, appellee rested its case-in-chief. Thereafter, the following exchange took place between appellant's counsel and the trial court: *Page 13 
 MR. OWEN: You know Judge, I've always made a Rule 29 motion and I'm not sure I'm going to do it here. But —
 THE COURT: I'll tell you what, I mean, in anticipation of the motion I certainly thought about it and I certainly think that viewing this in the light most favorable to the nonmoving party, there certainly is a jury question there.
 MR. OWEN: That's my view. So I've — not that I think it's a good question, but I think it's a question.
 THE COURT: But it's still a question. All right.
(Vol. V Tr. at 25-26.)
 {¶ 21} Dr. Martin Ryan, a psychiatrist, testified on behalf of appellant. Dr. Ryan testified that Moore had been diagnosed with having bipolar disorder and polysubstance dependence, and, after reviewing Moore's medical records, Dr. Ryan agrees with such diagnosis. Dr. Ryan testified that:
 Bipolar disorder is a persistent and severe mental illness. It's not just mood swings. It is an incurable brain illness. And it's characterized by mood episodes. Those mood episodes have to at least include a manic episode and a mixed episode and usually also include depressive episodes.
 * * *
 And a manic episode is a period of time that's at least a week when someone has a grandiose or an irritable mood and also must have certain other characteristics. They have to have four of a list of about seven or eight characteristics to qualify. These include racing thoughts, physical agitation or what we call psychomotor agitation, pressured speech, being argumentative, being hard to quiet down, decreased sleep. Those are some of the characteristics of a manic episode.
(Vol. V Tr. at 38-40.) *Page 14 
 {¶ 22} Dr. Ryan also testified that "[t]ypically bipolar illness when you're in a manic episode, a mixed episode or a depressive episode would impair judgment." (Vol. V Tr. at 42.) Furthermore, Dr. Ryan testified that the bipolar illness:
 * * * [M]akes it harder for the person to cope with stress because by definition in a manic episode they're irritable or grandiose. They have to have that in order to be in a manic episode. And that makes it harder for them to make judgments of what's appropriate to do in a response to stress. Also these are people who are not sleeping well. That's also a definition of a manic episode. They're getting very little or no sleep which impairs their ability to cope with stress.
(Vol. V Tr. at 43.)
 {¶ 23} Moreover, Dr. Ryan testified that a person with bipolar illness "is at higher risk of violence to themselves by suicidal acts or careless acts and injure themselves. And also violence to others." (Vol. V Tr. at 44.) Dr. Ryan testified that, in reviewing Moore's medical records and in particular a standardized test she took while being treated for the bipolar illness, he noticed that Moore "scored in the 96th percentile, meaning that 96 percent of people taking the test scored lower than she did in violence, 97 percent in judgment problems and 93 percent in coping problems." (Vol. V Tr. at 63.)
 {¶ 24} In addition, Dr. Ryan verified that Moore had been prescribed medication for her mental illness. Dr. Ryan surmised that Moore was responding well to the treatment, given that she had told one of her doctors that after starting the treatment she was not as depressed, irritable or "so quick to snap" as before. (Vol. V Tr. at 58.) Dr. Ryan also testified that Moore's last order for such medication was made on May 14, 2005. *Page 15 
 {¶ 25} Lastly, appellant's counsel asked Dr. Ryan the following hypothetical:
 Q. * * * I want you to assume that a person with the medical diagnosis and the medical history that's the same as you examined through Tamara Moore's records was prescribed medication and that commencing no later than September 1st of 2005 that person ceased taking their prescribed medication. And I want you to assume that the medication prescribed was the same that you observed in Tamara Moore's records.
 I want you to assume that in the month of November that person had one or more assaultive episodes of punching a neighbor. I want you to assume that that person was — and that that occurred in mid to late November. I want you to assume that that person had periods where they were — had excessive motor activity, by that I mean pacing or jumping up and down.
 I want you to assume that during period from — that in December 1st that person moved. I want you to assume that from the period from the 1st of December through 9:00 p.m. on December 7th — I'm sorry, 9:30 p.m. on December 7th
that that person was observed jumping, yelling, screaming, pacing. During that period on at least one occasion punched someone in the face and that in the evening hours of — and by evening I mean between 7:00 p.m. and 9:30 p.m. on December 7th when they were leaving a friend's house was seen literally jumping up and down.
 * * *
 Q. And would you have [an] opinion as to whether that person was in any one of the states of bipolar medical illness?
 A. Yes.
 * * *
 Q. And what is that opinion, Dr. Ryan?
 A. My opinion is in that hypothetical case that the person that you described would be in a manic or a mixed state. *Page 16 
 Q. And what effect does it have on the behavior?
 A. Those states are characterized by poor judgment, not sleeping very much, feeling irritable, often talking very quickly, having what we would call pressured speech. Sometimes being grandiose, self-important, infallible.
 * * *
 A. Someone in a mixed or a manic state is more likely to be violent either to themselves or to others.
(Vol. V Tr. at 67-68, 80-81.)
 {¶ 26} Todd Dowell testified as follows on behalf of appellant. Dowell befriended appellant and Moore, and, on the evening of December 7, 2005, at Dowell's home, Dowell socialized with appellant, Moore, and a man named Darryl who accompanied Moore and appellant. The group was drinking alcohol and, during the evening, appellant and Moore began to argue. One issue was appellant wanting to get back together with his wife, Angel Profitt, with whom he had separated. In an effort to diffuse the situation, Dowell took appellant and Darryl out for a drink. When appellant, Darryl, and Dowell returned to Dowell's home, appellant and Moore argued again. During the argument, Moore was acting in a "very aggressive" manner. (Vol. VI Tr. at 23.) She was pacing, stomping, and swearing. She stated: "I can't stand [appellant]. * * * I could kill him." (Vol. VI Tr. at 24.) Indeed, throughout the evening, Moore used the word "kill" "at least nine or ten times." (Vol. VI Tr. at 25.)
 {¶ 27} Ultimately, appellant and Moore went home. Thereafter, around 11:45 p.m. on the evening of December 7, 2005, Moore called Dowell's residence. Dowell and his wife were in bed, and Dowell placed the call on the speaker phone. During the phone call, Moore was "flipping out" about appellant wanting to get back together with *Page 17 
Angel Profitt. (Vol. VI Tr. at 42.) Moore also yelled at appellant, stating: "I hate you, I could just kill you." (Vol. VI Tr. at 42.)
 {¶ 28} After Moore ended her phone call, Dowell called appellant. It was then after midnight. Dowell "was worried and * * * afraid that something was going to get out of hand." (Vol. VI Tr. at 45.) Dowell had "heard [Moore] threaten [appellant] all night long and [Dowell] just didn't know how long [appellant] was going to be able to take it before they just start[ed] going back and forth." (Vol. VI Tr. at 45.) During the phone call, Dowell told appellant to just go to sleep. Meanwhile, Moore was in the background threatening appellant and stating that "if these kids was not in this house I will kill you." (Vol. VI Tr. at 47.) Appellant was not threatening Moore. Dowell also stated:
 Then [appellant says] * * * [s]he's going in my lock box getting my gun. I said [appellant] go to bed, just ignore her. [Appellant says that Moore is] standing by the bedroom door okay she's going through trying to get my gun out my * * * lock box. She got my gun. I was like [appellant], do not get up. * * *
 * * *
 [Appellant] was like I can't. She's over here waving a gun at me. * * *
 * * *
 [Appellant then said] hold on man, I got to get up.
(Vol. VI Tr. at 50-51.)
 {¶ 29} Thereafter, Dowell heard a scuffle and then a gunshot. Appellant came back on the phone and acted hysterically and was crying. Appellant stated that Moore "shot herself." (Vol. VI Tr. at 52.) Dowell told appellant to call 911. *Page 18 
 {¶ 30} Appellant testified as follows on his own behalf. Appellant had been married to Angel Profitt, and appellant and Profitt have three children. Appellant has no other children. In May 2005, appellant and Profitt decided to separate. Appellant met Moore around June 1, 2005, and, in August 2005, appellant and Moore rented an apartment together. Appellant knew that Moore was taking prescription medication for her bipolar mental illness. Moore had medication from a May prescription, but was unable to get the prescription re-filled.
 {¶ 31} In November 2005, appellant and Moore were evicted from their apartment. In the weeks following the eviction, appellant noticed that Moore got agitated easily. On one occasion, she kicked a hole in the wall, on another, she kicked the bathroom door open.
 {¶ 32} When appellant and Moore moved into a new apartment, they argued "over little stuff" every day. (Vol. VI Tr. at 103.) Likewise, appellant noticed that Moore was not sleeping well; she would be awake and watching television around 3 a.m.
 {¶ 33} On December 5, 2005, Moore hit appellant and, the next day, came after appellant with a knife. On December 7, 2005, appellant, Moore, and appellant's cousin, Darryl, drove to Dowell's house. Appellant dropped Moore and Darryl off at Dowell's house, and appellant went to pick up his children. Appellant was going to bring his children to Dowell's house.
 {¶ 34} When appellant returned to Dowell's house, Moore and appellant started to argue, and Dowell took appellant and Darryl out for a drink. When Dowell, appellant, and Darryl returned, appellant and Moore continued to argue. Moore stated to *Page 19 
appellant: "I can't stand you. If your kids wasn't here I'd kill you." (Vol. VI Tr. at 127.) Moore was "jumping up and down" and screaming and swearing. (Vol. VI Tr. at 128.)
 {¶ 35} Ultimately, appellant, Moore, and appellant's children left for home. Upon returning home, Moore and appellant continued to argue. Appellant left to go to his mother's house, but his mother was not home. Appellant returned home and went to bed. He brought his children to his bed, too. Meanwhile, Moore was on the phone "cussing [appellant] up and down the wall" and making threats against appellant. (Vol. VI Tr. at 130.)
 {¶ 36} After midnight on December 8, 2005, Dowell called. As to what occurred while he was on the phone with Dowell, appellant testified, as follows:
 A. [Moore] just continued, you know, being argumentative, pacing in and out the room, you know, blurting cuss words at me. I'm trying to, you know, talk to [Dowell]. He's trying to keep me calm because a couple of times I'm responding to a couple of the things she's saying to me which is I guess is making her, you know, angrier.
 * * *
 Q. * * * [D]uring that call was * * * [Moore] threatening you?
 A. Yes, she was.
 Q. And during that time did you see her go into the bedroom closet?
 A. I seen her pacing in and out the room. I seen her walk over by the closet out, but yes.
 Q. And did you see her subsequently go out the doorway?
 A. Yes, I did.
 * * * *Page 20 
 Q. And was she threatening to kill you in front of * * * your kids?
 A. Yes.
 * * *
 Q. How did she threaten to kill you in front of your kids?
 A. I mean, verbally to the point where I seen her, you know — it was just verbal until I noticed she was at the foot of the bed standing with the gun pointed at me and I'm on the bed laying using my youngest daughter kind of like a pillow on the phone with [Dowell]. Up to that point it was verbal until I fully acknowledged it right there.
 Q. At that time, [Dowell], did you know where the gun was located?
 A. Yes.
 Q. Where was it stored?
 A. It was stored in the closet.
 Q. * * * Now, when you saw her with the gun do you recall where she was when you first saw her, do you recall whether she was by the closet or do you recall whether she was by the one in the hall?
 A. When I saw her with it out she was standing by the foot of the bed.
 * * *
 I was more so just like shocked more than anything. I'm like here she is * * * playing with the gun. I got up to basically just try to like grab her wrist to turn it up or and then when I did that and pushed her back, you know, she fell slipping over the bed and I fell forward with her and that's when it went off. You know, I twisted her wrist, you know, so it was in between us, you know, like I was stating and then when I had pushed her back, you know, she fell over the bed, I fell forward with her and it went off so fast, you know, I thought it hit the wall. You know, I immediately let go, finished falling *Page 21 
with her, you know. One hand went on the bed, the other on the floor.
(Vol. VI Tr. at 133-137.)
 {¶ 37} Next, appellant testified as follows:
 Q. When you saw [Moore] at the foot of the bed with the gun, how was she holding it, if you recall?
 A. She was holding it with one hand with her right hand just pointed at me.
 Q. And did she ever change positions?
 A. I mean, yeah, she did. She grabbed it with two hands saying what if I do this. That's after I got up, of course, and was walking like give me the gun.
 * * *
 Q. So when [Moore] said to you what if I do this, did she then put it from one hand into two hands?
 A. Yes.
 Q. And at that point, if you recall, was the gun cocked?
 A. To tell you the truth I don't know if it was or not. I wasn't paying too much attention, you know, to if it was cocked or not. * * *
 * * *
 Q. * * * And when [Moore] had her hand — both hands on the gun, what did you do?
 A. * * * I wanted to turn her hand up so she'd drop it and put pain on her. When I pushed her back, she tried to pull it back. Pushed her, I wanted her to drop. She fell over the bed, I fell forward with her. That's when it went off. I just let go. We both fell though. I twisted her wrist up like this and pushed her. When she fell, she fell backwards over the bed. I fell forward with her. It went off and from there I let go of her hand. *Page 22 
 * * *
 Q. * * * How did you know that she went into the closet to get the gun?
 A. One, I seen her go in the closet. You know, two, that's where I kept it. * * * So yeah, I seen her grab it and walk out.
 * * *
 Q. You state [in your recorded interview with police] when she gets [the gun] out of the case [you] jump out of the bed and rush her. Was that true?
 A. Yes. After she gets it out.
 * * *
 Q. Did you expect any way that that gun would go off?
 A. No. None.
 Q. And up until the time that gun went off — from the time you saw the gun until the gun went off, what was your purpose?
 A. My purpose was just to make sure that, you know, my kids was safe first off, to get the gun and just basically put it up. You know, make sure my kids was safe.
 Q. Was there any intention on your part for that gun to be fired?
 A. No.
 * * *
 Q. Then the detective says well, you described to us how she was taking the gun out of the case and you answered she took it out of the case and everything and she had it in her hands, but past that I don't know. I was lying in bed with my daughter when I seeing her doing that. Why did you say that? *Page 23 
 A. Because I didn't know what she had done with the gun case. I had seen her come in the room, I seen her go out the room. I didn't know exactly when she grabbed it. I just seen her walk in the area. I didn't know that she, you know, had it until I seen her at the foot of the bed. So I just assumed that she had to go and get it out the gun case because that's where I kept it.
(Vol. VI Tr. at 141-143, 153-154, 156, 159-160.)
 {¶ 38} On cross-examination, appellant testified:
 Q. * * * [Y]ou told the detectives that as soon as you saw her getting the case you jumped up out of bed; correct?
 A. Yes. But what I was thinking, you know, I didn't see her grab the case per se. I knew she had the gun because she was standing there at the foot of my bed. I knew that she had to get the gun out the closet because that's where I kept my gun case. I seen her walk in and out. I thought she had went to the bathroom. So evidently she must have grabbed it out of my closet, walked out there, you know, something because when I seen her in there, you know, she was just standing right there at the foot of my bed with it. And she's cussing at me. I was on the phone. I wasn't trying to pay her no attention. I was trying to ignore her and talk on the phone.
(Vol. VI Tr. at 194.)
 {¶ 39} During closing argument, appellant's counsel reminded the jury how "combative [Moore] was" and that "she was getting more and more violent." (Vol. VII Tr. at 52.) Appellant's counsel then argued:
 * * * [W]hen you look at all the evidence you can't have a reasonable doubt as to what his purpose was that night. You can't. You can't. There is no way. No way that they have met their burden that he acted or did anything with the intent to cause [Moore's] death. Pure and simple it was a tragic accident. And the appropriate verdict is not guilty. * * *
(Vol. VII Tr. at 52-53.) *Page 24 
 {¶ 40} Before the jury deliberated, the trial court provided the following jury instructions:
 * * * [Appellant] must be acquitted of this offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense[s].
 * * *
 [Appellant] is charged with murder in the indictment. Before you can find [appellant] guilty of murder you must find that the State of Ohio has proved beyond a reasonable doubt that on or about the 8th day of December, 2005 and in Franklin County, Ohio [appellant] purposely caused the death of Tamara Moore.
 * * *
 A person acts purposely when it is his specific intention to cause a certain result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. It must be established in this case that at the time in question there was present in the mind of [appellant] a specific intention to cause the death of Tamara Moore.
 I used the word cause, as in cause the death. Cause is an act or failure to act which in a natural and continuous sequence directly produced the death and without which it would not have occurred.
 * * *
 Now, if you find that the State failed to prove beyond a reasonable doubt any of the elements of murder you will find [appellant] not guilty of the offense of murder and you will then consider the lesser offense of reckless homicide.
 Before you can find [appellant] guilty of reckless homicide you must find beyond a reasonable doubt that on or about the 8th day of December, 2005 and in Franklin County, Ohio [appellant] recklessly caused the death of Tamara Moore. *Page 25 
 * * * A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result. Risk means a significant possibility as contrasted with a remote possibility that a certain result may occur.
 I've already defined the word cause for you and that definition applies equally here.
(Vol. VII Tr. at 76, 82-83, 85-86.)
 {¶ 41} During deliberation, the jury asked for a definition of "recklessness" in "plain terms." (Vol. VII Tr. at 142.) The trial court gave the following answer:
 * * * To assist in understanding the legal definition of recklessly given to you, please consider the following which should be considered with the definition already provided you in the jury instructions.
 A person is said to be reckless when without caring about the consequences he obstinately or perversely disregards a known and significant possibility that his conduct is likely to cause a certain result. * * *
(Vol. VII Tr. at 142-143.)
 {¶ 42} Ultimately, the jury found appellant not guilty of murder, but guilty of reckless homicide with an accompanying firearm specification. Thereafter, on February 1, 2007, appellant's counsel filed a Crim.R. 29(C) motion for acquittal. The trial court did not expressly rule on the Crim.R. 29(C) motion, but, rather, the trial court proceeded to sentence appellant to a total of eight years imprisonment. The trial court first sentenced appellant to five years imprisonment for the reckless homicide conviction. The five-year prison sentence constituted the maximum authorized prison sentence for the third-degree felony. See R.C. 2929.14(A)(3). Pursuant to R.C. 2941.145 and 2929.14(D)(1)(a)(ii), the trial court sentenced appellant to an additional mandatory three years imprisonment on the firearm specification. *Page 26 
 {¶ 43} Appellant appeals, raising seven assignments of error:
 [1.] The court committed plain error by failing to include an instruction on accident in the jury instructions.
 [2.] The court committed plain error by not instructing the jury regarding when the use of non deadly force is justified either in self-defense or in the defense of others.
 [3.] The evidence was legally insufficient to establish appellant recklessly caused the death of another.
 [4.] The evidence was legally insufficient to support conviction on the firearm specification.
 [5.] Counsel's omissions with regard to instructions, and the failure to seek acquittal on the principal charge at the close of the state's case denied appellant his Sixth Amendment and Article I, Section 10 right to the effective assistance of counsel.
 [6.] Appellant's convictions were against the manifest weight of the evidence.
 [7.] The court erroneously imposed a sentence in excess of the statutory minimum for an offender who had not previously served time in prison.
 {¶ 44} Before addressing the merits of appellant's appeal, we note that the trial court never journalized a decision on appellant's Crim.R. 29(C) motion for acquittal. However, we may properly presume that the trial court effectively denied the motion when it entered a judgment of conviction against appellant. See Akron v. Molyneaux (2001),144 Ohio App.3d 421, 425-426. Therefore, the Crim.R. 29(C) motion is not outstanding, and, thus: (1) appellant is appealing from a final appealable order; and (2) we have jurisdiction to entertain appellant's appeal. See R.C. 2505.02. *Page 27 
 {¶ 45} In his first assignment of error, appellant contends that the trial court committed plain error by not providing a jury instruction on the defense of accident. We disagree.
 {¶ 46} "The court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." State v. Joy, 74 Ohio St.3d 178, 181, 1995-Ohio-259, citing State v. Comen (1990), 50 Ohio St.3d 206, paragraph two of the syllabus. Here, appellant claims that he was entitled to a jury instruction on the defense of accident.
 {¶ 47} When a defendant raises the defense of accident, `"the defendant denies any intent * * * He denies that he committed an unlawful act and says that the result is accidental.'" State v.Poole (1973), 33 Ohio St.2d 18, 20, quoting 4 Ohio Jury Instructions (1970) 177, Section 411.01. The defense of accident is "tantamount to a denial that an unlawful act was committed; it is not a justification for the defendant's admitted conduct. * * * Accident is an argument that supports a conclusion that the state has failed to prove the intent element of the crime beyond a reasonable doubt." State v.Atterberry (1997), 119 Ohio App.3d 443, 447.
 {¶ 48} Here, appellant maintained that Moore's death resulted from an accidental shooting, and appellant's counsel argued that Moore died through a "tragic accident" resulting from a struggle with a gun. (Vol. VII Tr. at 53.) However, appellant's counsel did not request a jury instruction on the accident defense, and appellant's counsel did not object to the trial court's omission of such an instruction. Absent plain error, a party forfeits error concerning jury instructions if the party fails to object before the jury retires. State v. Jackson,92 Ohio St.3d 436, 444, 2001-Ohio-1266. *Page 28 
 {¶ 49} According to the plain error doctrine, enunciated in Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." State v. Barnes, 94 Ohio St.3d 21, 27,2002-Ohio-68. Under the plain error standard:
 * * * First, there must be an error, i.e., a deviation from a legal rule. * * * United States v. Olano (1993), 507 U.S. 725, 732
* * * (interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b]). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings.
 * * * [S]ee, also, Olano, 507 U.S. at 734 * * * (a plain error under Fed.R.Crim.P. 52[b] is `"clear' or, equivalently, `obvious'" under current law). Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. * * *
Barnes at 27.
 {¶ 50} Our recognition of plain error, however, is discretionary. See id. Indeed, the Ohio Supreme Court has "admonish[ed] courts to notice plain error `with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" Id., quotingState v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 51} We have previously held:
 Generally, although a trial court errs by failing to provide a jury instruction on the accident defense when the facts of a case warrant such an instruction, "`if the trial court's general charge was otherwise correct, it is doubtful that this error of omission would ever satisfy the [test] for plain error'" by affecting the outcome of the trial. See State v. Smith (May 10, 1996), Miami App. No. 95-CA-17, quoting State v. *Page 29 Stubblefield (Feb. 13, 1991), Hamilton App. No. C-890597; State v. Thomas (Aug. 29, 1997), Hamilton App. No. C-960242 ("Thomas"). Such is the case "[b]ecause the accident defense is not an excuse or justification for the admitted act," and the effect of such an instruction "would simply * * * remind the jury that the defendant presented evidence to negate the" requisite mental element * * * Smith; Thomas. In this regard, "[i]f the jury had credited [the defendant's] argument, it would have been required to find [the defendant] not guilty * * * pursuant to the court's" general instructions. See State v. Manbevers (Sept. 28, 1994), Pickaway App. No. 93CA23.
State v. Johnson, Franklin App. No. 06AP-878, 2007-Ohio-2792, at ¶ 63.
 {¶ 52} Similarly, in State v. Glagola, Stark App. No. 2003CA00006,2003-Ohio-6018, at ¶ 26-27, the Fifth District Court of Appeals concluded that a trial court did not commit plain error by failing to provide an accident defense instruction on the charges of murder and reckless homicide. The court noted that the trial court provided standard definitions of murder and reckless homicide. Id. at ¶ 26. Utilizing the plain error analysis, the appellate court concluded that the accident defense instruction would not have added anything to the general instruction. Id.; but, see, State v. Howell (2000),137 Ohio App.3d 804, 813-815 (utilizing a harmless error analysis, the Eleventh District Court of Appeals reversed a defendant's convictions because the trial court failed to provide a requested accident defense instruction on a charge containing a reckless mental element).
 {¶ 53} Here, we need not recognize any plain error in regards to an accident instruction on the murder charge because the jury acquitted appellant of the murder charge. See Barnes at 27 (stating that we recognize plain error "`only to prevent a manifest miscarriage of justice'"). In regards to the reckless homicide charge, we note that the trial court instructed the jury that appellee bore the burden of proof beyond a *Page 30 
reasonable doubt on every essential element of reckless homicide, including the mental element of reckless. Moreover, in accordance with R.C. 2901.22(C), the trial court defined reckless as a perverse disregard or heedless indifference to the consequences. Such a definition "could easily allow jurors to understand that reckless conduct goes beyond what is considered to be an accident." State v.Skeens (Dec. 19, 2001), Noble App. No. 286, citing State v. Tiber (May 17, 1990), Belmont App. No. 88B28. Therefore, as in Glagola, and utilizing the plain error doctrine in harmony with Johnson, we conclude that an accident defense instruction would not have added anything to the general instruction in regards to appellant's reckless homicide charge. Accordingly, we hold that an accident defense jury instruction would not have affected the outcome of appellant's case, and the trial court did not commit plain error by not providing an accident defense jury instruction, and we overrule appellant's first assignment of error.
 {¶ 54} In his second assignment of error, appellant argues that the trial court committed plain error by not instructing the jury regarding the use of non-deadly force in self-defense. We disagree.
 {¶ 55} Appellant's counsel neither requested a self-defense instruction nor objected to such an instruction not being included in the jury instructions. Thus, we review appellant's contentions under the plain error standard. Barnes at 27. As noted above, the trial court must give all instructions that are relevant and necessary for the jury.Joy at 181.
 {¶ 56} Appellant does not contend that an instruction on self-defense through deadly force was warranted in regards to the shooting, and such an instruction would be in contradiction to appellant's accident defense. See Johnson at ¶ 43. Indeed, appellant *Page 31 
recognizes that, "[b]ased on appellant's testimony, no instruction on self-defense through the use of deadly force was warranted because he claimed the gun discharged accidentally, not intentionally." (Appellant's brief at 17.) Rather, appellant claims that "the circumstances did require an instruction on the use of non-deadly force adjunct to an instruction on accident. This was necessary to put before the jury the question whether given the circumstances appellant was justified in making an effort to wrest the gun away from Ms. Moore." (Appellant's brief at 17.)
 {¶ 57} In State v. LaFreniere (1993), 85 Ohio App.3d 840, 848, the Eleventh District Court of Appeals recognized that "an instruction on the events leading up to [a] shooting" is "not mandatory." InLeFrenier, a defendant was tried and convicted for murder after a shooting incident. Id. at 842. The defendant testified that he was socializing with Randy Evans and Edward Wojiechowski and eventually asked them to leave. Later, the defendant was awakened by some noise, and he grabbed his gun to investigate. He saw Evans, and Evans demanded money. When the defendant pointed the gun in the direction of a noise, he was "pushed in the back and then struck across the left side of his face." Id. The defendant fell into a wall while Evans "wrestled the gun from him." Id. As a result of the defendant being punched and falling, he became dizzy. When the defendant regained his senses, he saw that Wojiechowski had been shot. Evans told the defendant "that `they' had shot the victim during the scuffle for the gun." Id.
 {¶ 58} At trial, the defendant requested a jury instruction on self-defense, and the trial court refused to provide the instruction. Id. at 845. The Eleventh District Court of Appeals concluded that, "even though a weapon was originally drawn in self-defense, it *Page 32 
does not necessarily mean that it was ultimately used in such a manner. * * * Additional instruction[s] as to the nature of the events leading up to [the shooting] would seem to be merely permissible rather than mandatory." Id. at 847. Thus, the appellate court did not find prejudice stemming from the trial court's refusal to provide the requested self-defense instruction. See id. at 848-849.
 {¶ 59} Here, like LaFrenier, appellant's self-defense claim concerns events leading up to the shooting and does not relate to the shooting itself. Specifically, appellant utilizes the self-defense claim to explain why he struggled with Moore to gain control of the gun. Yet, it is the accident defense, and not self-defense, that appellant ultimately utilized to explain the shooting itself. Thus, like LaFrenier, the self-defense instruction was not mandatory here, and, utilizing the plain error analysis under Barnes, we find no prejudice to appellant for the trial court's failure to provide such an instruction. Therefore, we overrule appellant's second assignment of error.
 {¶ 60} We address appellant's third, fourth, and sixth assignments of error together. In these assignments of error, appellant contends that his conviction for reckless homicide with a firearm specification is based on insufficient evidence and is against the manifest weight of the evidence. We disagree.
 {¶ 61} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following *Page 33 Jackson v. Virginia (1979), 443 U.S. 307; State v. Yarbrough,95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. Jenks at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. SeeJenks, paragraph two of the syllabus; Yarbrough at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim); State v. Lockhart (Aug. 7, 2001), Franklin App. No. 00AP-1138.
 {¶ 62} First, we address appellant's claim that his reckless homicide conviction is based on insufficient evidence. R.C. 2903.041 prescribes reckless homicide and states, in pertinent part, that "[n]o person shall recklessly cause the death of another." Under R.C. 2901.22(C):
 A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
 {¶ 63} Here, sufficient evidence established that appellant recklessly caused Moore's death. Initially, we recognize that Dr. Cox's testimony established that Moore died from the gunshot wound she sustained in the December 2005 shooting. Next, we conclude that sufficient evidence established that appellant recklessly caused Moore's death during the shooting. In so concluding, we note that through appellant's own admissions to Detectives Fulton and Weeks, through results of the gunshot residue *Page 34 
testing, and through Hardy's conclusions, the evidence established that the shooting occurred while appellant and Moore were very close to each other. Next, we note that Hardy testified that the firearm used in the shooting incident could not be fired any other way than through the application of pressure on the trigger. Thus, as Hardy testified, the gun was not "more likely than others to go off unintentionally." (Vol. IV Tr. at 34.) Considering this, we next note that Dr. Cox's testimony established the unlikelihood that Moore could have inflicted the wound upon herself. Again, Dr. Cox testified that "I had a hard time grasping how an individual [like Moore] could contort themselves with being right handed and getting a near contact wound in the angle that we were getting and at the same time putting a soot like pattern on their left forearm, both the left forearm and the left arm." (Vol. IV Tr. at 94.) Dr. Cox characterized the marks on Moore's left arm as "defensive injuries" that consist of an individual "raising their arm up to ward off the bullets that are coming at them." (Vol. IV Tr. at 92.) Next, we find it significant that appellant admitted during his interview with Detectives Fulton and Weeks that he had the gun in his hand when it "discharge[d] and [Moore fell] to the ground." (Vol. III Tr. at 227.) Given such evidence, and construing the evidence in a light most favorable to appellee, we conclude that the jury could have reasonably inferred that appellant gained sufficient control of the gun during the struggle to place pressure on the gun's trigger while in close proximity to Moore and "with heedless indifference to the consequences" and "perversely disregarding] a known risk that his conduct [was] likely to cause" Moore's death. (Vol. VII Tr. at 86.)
 {¶ 64} In so concluding, we recognize that appellant claimed he wanted to take the gun away from Moore to protect him and his children. However, we cannot say that *Page 35 
appellant actually fired the gun in an act of self-defense or defense of another because appellant provided no evidence to support such a conclusion. See State v. Cooper, 170 Ohio App.3d 418, 2007-Ohio-1186, at ¶ 32 (recognizing that the defendant bears the burden to establish self-defense); State v. Smith, Franklin App. No. 01AP-848, 2002-Ohio-1479 (recognizing that the defendant bears the burden to establish the defense of another). Thus, we conclude that appellant's reckless homicide conviction was based on sufficient evidence.
 {¶ 65} In addition, appellant argues that his firearm specification conviction is based on insufficient evidence. Appellant was convicted of a firearm specification based on R.C. 2941.145, which applies when "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." Here, given our above conclusions, we also find that sufficient evidence allowed the jury to infer that appellant had control of the firearm when it was fired and, necessarily, that appellant used the firearm to commit the reckless homicide. Therefore, we conclude that appellant's firearm specification conviction was based on sufficient evidence.
 {¶ 66} Next, appellant argues that his conviction for reckless homicide with a firearm specification is against the manifest weight of the evidence. In determining whether a verdict is against the manifest of the evidence, we sit as a "`thirteenth juror.'" Thompkins at 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its *Page 36 
way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quotingState v. Martin (1983), 20 Ohio App.3d 172, 175; see, also, Columbus v.Henry (1995), 105 Ohio App.3d 545, 547-548. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 67} Appellant asserts that his conviction is against the manifest weight of the evidence because "[t]he only reasonable conclusion is that the gun fired accidentally as appellant struggled to take it away from Ms. Moore after an evening of erratic behavior, arguments, and death threats, all consistent with her mental illness." (Appellant's brief at 29.) However, as noted above, the jury had forensic evidence and expert testimony that allowed it to reasonably infer not that Moore sustained fatal wounds from a gun that accidentally fired, but from appellant gaining sufficient control of the firearm to place pressure on its trigger and fire the gun while in close proximity to Moore. Thus, it was within the province of the jury to convict appellant of reckless homicide with a firearm specification. As such, we conclude that appellant's conviction is not against the manifest weight of the evidence. Having already found sufficient evidence to support appellant's conviction for reckless homicide with a firearm specification, we overrule appellant's third, fourth, and sixth assignments of error. *Page 37 
 {¶ 68} In his fifth assignment of error, appellant contends that his counsel rendered ineffective assistance of counsel. We disagree.
 {¶ 69} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. Strickland v. Washington (1984),466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 70} In Johnson, we concluded that trial counsel did not render ineffective assistance by failing to request an accident defense instruction. Id. at ¶ 69. We noted that such an instruction would not have added anything to the instructions that the trial court did provide. Id. at ¶ 67-69. Here, like Johnson, we concluded above that an accident defense instruction would not have added anything to the instructions that the trial court did provide. Thus, likeJohnson, we conclude that appellant's counsel did not render ineffective assistance by failing to request an accident defense instruction on the reckless homicide charge.
 {¶ 71} In so concluding, we find inapposite appellant's reliance onAtterberry. In Atterbury, the Eighth District Court of Appeals concluded that counsel of a defendant, being tried for having a weapon while under disability and felonious assault with specifications, rendered ineffective assistance for: (1) failing to object to a trial court's *Page 38 
failure to include in its jury instructions an accident defense instruction; and (2) failing to "preserve the issue for appeal" by not objecting to the omitted instruction. Id. at 448. The court noted that "[t]he facts of this case clearly support a jury instruction on accident." Id. The court also noted that:
 * * * Although the court was disinclined to give such a charge [on the accident defense], the matter was left open. The court's final statement to defense counsel was "We'll leave it with you." Clearly, the [defendant's] trial counsel * * * failed to present to the court a final chance to consider instructing the jury on the issue of accident.
Id. at 448.
 {¶ 72} However, Atterbury does not negate our above conclusions. For example, in finding ineffective assistance of counsel, the court inAtterbury seemed particularly disturbed by the defendant's counsel failing to request the accident instruction after the trial court effectively allowed it; that is not the case here. Likewise, we note that, in Atterbury, the appellate court did not examine the impact on the jury of the instructions that the trial court did provide. Again, here, as in our case in Johnson, we have concluded that an accident defense instruction would not have added anything to the instructions that the trial court did provide.
 {¶ 73} Next, appellant argues that his counsel was ineffective for failing to request an instruction on the right to self-defense through exercise of non-deadly force. However, we concluded above that a self-defense instruction was not mandatory here and that there was no prejudice to appellant for the trial court's omission of such an instruction. Thus, we conclude that appellant's counsel did not render ineffective assistance when it failed to request the self-defense instruction. *Page 39 
 {¶ 74} Lastly, appellant contends that his counsel was ineffective for not making a Crim.R. 29 motion for acquittal at the close of appellee's case-in-chief. Appellant argues "[p]erhaps accident remained a jury issue at the close of the state's case, but at the very least counsel should have forcibly argued that trial go forward only with respect to the lesser included offense of reckless homicide." (Appellant's brief at 28.)
 {¶ 75} To the extent that appellant asserts that his counsel should have argued that trial go forward only with respect to reckless homicide, we note that the jury acquitted appellant on the greater offense of murder. Moreover, despite appellant's counsel not making the Crim.R. 29 motion, we note that the trial court nonetheless indicated that it had given some thought to a Crim.R. 29 issue and concluded "that viewing this in the light most favorable to the nonmoving party, there certainly is a jury question there." (Vol. V Tr. at 25.) Thus, we find no prejudice to appellant from his counsel not making a Crim.R. 29 motion for acquittal at the close of appellee's case-in-chief. Therefore, we conclude that appellant's counsel did not render ineffective assistance by failing to make such a motion.
 {¶ 76} For these reasons, we conclude that appellant's counsel did not render ineffective assistance, and we overrule appellant's fifth assignment of error.
 {¶ 77} Lastly, in his seventh assignment of error, appellant contends that the trial court erred by sentencing him to a maximum prison sentence on his reckless homicide conviction upon adhering to State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856. In Foster, the Ohio Supreme Court severed particular provisions of Ohio's felony sentencing law that, in part, required particular findings before a trial court could impose maximum sentences and, for individuals who, like appellant, had not previously been in *Page 40 
prison, more than the minimum prison sentences. Appellant argues that the severance remedy, which became effective after appellant was indicted, but before he was sentenced, violated due process and ex post facto constitutional principles against retroactivity. Thus, appellant argues that, despite the Foster severance remedy, he was entitled to a minimum prison sentence on his reckless homicide conviction "in accordance with the law in effect at the time the crime was committed." (Appellant's brief at 31.) However, we have consistently rejected this argument. See State v. Wilson, Franklin App. No. 07AP-224,2007-Ohio-4801, at ¶ 6. Thus, we conclude that the trial court did not violate constitutional principles against retroactivity when, upon adhering to the Foster severance remedy, it sentenced appellant to the maximum prison sentence on his reckless homicide conviction, and we overrule appellant's seventh assignment of error.
 {¶ 78} In summary, we overrule appellant's first, second, third, fourth, fifth, sixth, and seventh assignments of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 BRYANT and BROWN, JJ., concur. *Page 1